

FILED

4:53 pm, 8/16/24

Margaret Botkins
Clerk of Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING



Margaret Botkins
Clerk of Court

Jon Bastian
Chief Deputy Clerk

August 16, 2024

Chris Wolpert, Clerk of Court
United States Court of Appeals for the 10th Circuit
Byron R. White Courthouse
1823 Stout Street
Denver, CO  80257

> Re:  American Wild Horse Campaign et al v. United States Bureau of Land Management
> Director et al
> District Court Case Number:  23-cv-00084-KHR
> Member cases: 2:23-cv-00087-KHR &  2:23-cv-00117-KHR
> Notice of Appeal Filed:        8/16/2024
> $600 fee was not paid; $5 fee was not paid.
> Receipt Number: N/A

Dear Mr. Wolpert:

Attached are documents filed in connection with the Notice of Appeal in this case, which will constitute the preliminary record on appeal:

- Copy of District Court docket entries

- Copy of Notice of Appeal

- Copy of the District Court's final judgment or order(s) from which the appeal is taken, as follows:

[80] ORDER  & [81] FINAL JUDGMENT

If anything further is required, please let me know.

Sincerely,

Margaret Botkins
Clerk of Court

By:_____
Tiffany Dyer

APPEAL,LEADTR,TERMED

# U.S. District Court
## District of Wyoming (Cheyenne)
## CIVIL DOCKET FOR CASE #: <u>2:23−cv−00084−KHR</u>
### *Internal Use Only*

| | |
|---|---|
| American Wild Horse Campaign et al v. United States Bureau of Land Management Director et al | Date Filed: 05/10/2023 |
| | Date Terminated: 08/14/2024 |
| Assigned to: District Judge Kelly H Rankin | Jury Demand: None |
| Member cases: | Nature of Suit: 893 Environmental Matters |
|    2:23−cv−00087−KHR | Jurisdiction: U.S. Government Defendant |
|    2:23−cv−00117−KHR | |

Related Cases:  2:11−cv−00263−NDF
                2:14−cv−00152−NDF
                2:17−cv−00170−NDF
                2:23−cv−00087−KHR
                2:23−cv−00048−KHR
                2:23−cv−00117−KHR

Cause: 42:4321 Review of Agency Action−Environment

**Petitioner**

| | | |
|---|---|---|
| **American Wild Horse Campaign** | represented by | **Leah C Schwartz** |
| | | PARSONS BEHLE & LATIMER |
| | | 20 East Simpson Ave. |
| | | P. O. Box 3890 |
| | | Jackson, WY 83001 |
| | | 307−733−5130 |
| | | Email: LSchwartz@parsonsbehle.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **William S Eubanks , II** |
| | | EUBANKS & ASSOCIATES PLLC |
| | | 1629 K Street NW |
| | | Suite 300 |
| | | Washington, DC 20006 |
| | | 970−703−6060 |
| | | Email: bill@eubankslegal.com |
| | | *LEAD ATTORNEY* |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Matthew R Arnold** |
| | | EUBANKS & ASSOCIATES PLLC |
| | | 1629 K Street, NW |
| | | Ste 300 |
| | | Washington, DC 20006 |
| | | 843−718−4513 |

Email: matt@eubankslegal.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Petitioner**

**Animal Welfare Institute**                  represented by  **Leah C Schwartz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William S Eubanks , II**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew R Arnold**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Petitioner**

**Western Watersheds Project**               represented by  **Leah C Schwartz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William S Eubanks , II**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew R Arnold**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Petitioner**

**Carol Walker**                             represented by  **Leah C Schwartz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William S Eubanks , II**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew R Arnold**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Petitioner**

**Chad Hanson**                          represented by  **Leah C Schwartz**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **William S Eubanks , II**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *PRO HAC VICE*
                                         *ATTORNEY TO BE NOTICED*

                                         **Matthew R Arnold**
                                         (See above for address)
                                         *PRO HAC VICE*
                                         *ATTORNEY TO BE NOTICED*

**Petitioner**

**Kimerlee Curyl**                       represented by  **Leah C Schwartz**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **William S Eubanks , II**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *PRO HAC VICE*
                                         *ATTORNEY TO BE NOTICED*

                                         **Matthew R Arnold**
                                         (See above for address)
                                         *PRO HAC VICE*
                                         *ATTORNEY TO BE NOTICED*

V.

**Intervenor Respondent**

**State of Wyoming**                     represented by  **D. David DeWald**
                                         WYOMING ATTORNEY GENERAL
                                         Water & Natural Resources Division
                                         109 State Capitol
                                         Cheyenne, WY 82002
                                         307–777–6199
                                         Fax: 307–777–3542
                                         Email: david.dewald@wyo.gov
                                         *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Travis Steven Jordan**
WYOMING ATTORNEY GENERAL'S
OFFICE
109 State Capitol
Cheyenne, WY 82002
307/777–7895
Fax: 307/777–3542
Email: travis.jordan@wyo.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannon Leininger**
WYOMING ATTORNEY GENERAL'S
OFFICE
Water & Natural Resources Division
109 State Capitol
Cheyenne, WY 82002
307–777–5780
Fax: 307–777–3542
Email: shannon.leininger@wyo.gov
*ATTORNEY TO BE NOTICED*

**Intervenor Respondent**

| **Rock Springs Grazing Association**<br>*a Wyoming corporation* | represented by | **Constance E Brooks**<br>FAIRFIELD AND WOODS PC<br>1801 California Street, Suite 2600<br>Suit<br>80202<br>Denver, CO 80111–3054<br>303–830–2400<br>Fax: 303–830–1033<br>Email: cbrooks@fwlaw.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Danielle Rae Bettencourt**<br>FAIRFIELD AND WOODS PC<br>1801 California Street<br>Suite 2600<br>Denver, CO 80202<br>303–894–4431<br>Email: dbettencourt@fwlaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

V.

**Respondent**

| | | |
|---|---|---|
| **Bureau of Land Management Director**<br>*in her official capacity*<br>*also known as*<br>Tracy Stone–Manning | represented by | **C Levi Martin**<br>UNITED STATES ATTORNEYS<br>OFFICE<br>PO Box 668<br>Cheyenne, WY 82003–0668<br>307/772–2124<br>Fax: 307/772–2123<br>Email: christopher.martin@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Maggie Baker Smith**<br>DOJ–Enrd<br>Wildlife and Marine Resources Section<br>7600 Sand Point Way NE<br>Seattle, WA 98115<br>206–598–3088<br>Fax: 202–305–0275<br>Email: maggie.smith@usdoj.gov<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kimberly Anne Cullen**<br>DOJ–Enrd<br>150 M Street NE<br>Washington, DC 20002<br>202–305–0503<br>Email: kimberly.cullen@usdoj.gov<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Respondent**

| | | |
|---|---|---|
| **United States Department of Interior Secretary**<br>*in her official capacity*<br>*also known as*<br>Deb Haaland | represented by | **C Levi Martin**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Maggie Baker Smith**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Kimberly Anne Cullen**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Consolidated Plaintiff**

represented by

**Friends of Animals**
*a 501(c)(3) organization*

**Brittany Nicole Thorpe**
DOMONKOS LAW OFFICE LLC
1914 Logan Ave
Cheyenne, WY 82001
307–426–5015
Email: brittany@dandt.llc
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Best**
Friends of Animals
Wildlife Law Program
7500 E. Arapahoe Road
Suite 385
Centennial, CO 80112
720–949–7791
Email: jennifer@friendsofanimals.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Huss**
Friends of Animals
7500 East Arapahoe
Ste 385
Centennial, CO 80112
720–949–7791
Email: rhuss@friendsofanimals.org
*TERMINATED: 08/02/2024*
*LEAD ATTORNEY*
*PRO HAC VICE*

**Consolidated Plaintiff**

**Return to Freedom**
*a nonprofit organization*

represented by **Bruce A. Wagman**
RILEY SAFER HOLMES & CANCILA
LLP
456 Montgomery Street
Ste 16th Floor
San Francisco, CA 94104
415–275–8540
Fax: 415–275–8551
Email: bwagman@rshc–law.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dawn Rae Scott**
925 Canyon View Ave
Cody, WY 82414
307–761–2040
Email: drscottatty@gmail.com
*TERMINATED: 06/12/2023*
*LEAD ATTORNEY*

**Erin Pamela Gasparka**
RILEY SAFER HOLMES & CANCILA
LLP
Three First National Plaza
70 W. Madison Street
Suite 2900
Chicago, IL 60602
920–255–2435
Email: egasparka@rshc–law.com
*TERMINATED: 08/18/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*

**Stephenson D Emery**
WILLIAMS PORTER DAY & NEVILLE
159 North Wolcott, Suite 400
P O Box 10700
Casper, WY 82602
307/265–0700
Fax: 307/266–2306
Email: semery@wpdn.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**Front Range Equine Rescue**                    represented by   **Bruce A. Wagman**
*a nonprofit organization*                                        (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Dawn Rae Scott**
                                                                  (See above for address)
                                                                  *TERMINATED: 06/12/2023*
                                                                  *LEAD ATTORNEY*

                                                                  **Erin Pamela Gasparka**
                                                                  (See above for address)
                                                                  *TERMINATED: 08/18/2023*
                                                                  *LEAD ATTORNEY*
                                                                  *PRO HAC VICE*

                                                                  **Stephenson D Emery**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

**Meg Frederick**                                represented by   **Bruce A. Wagman**
                                                                  (See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dawn Rae Scott**
(See above for address)
*TERMINATED: 06/12/2023*
*LEAD ATTORNEY*

**Erin Pamela Gasparka**
(See above for address)
*TERMINATED: 08/18/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*

**Stephenson D Emery**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consolidated Plaintiff**

| | | |
|---|---|---|
| **Angelique Rea** | represented by | **Bruce A. Wagman** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dawn Rae Scott**
(See above for address)
*TERMINATED: 06/12/2023*
*LEAD ATTORNEY*

**Erin Pamela Gasparka**
(See above for address)
*TERMINATED: 08/18/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*

**Stephenson D Emery**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Consolidated Defendant**

| | | |
|---|---|---|
| **Bureau of Land Management** | represented by | **C Levi Martin** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimberly Anne Cullen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maggie Baker Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Consolidated Defendant**

| | | |
|---|---|---|
| **Bureau of Land Management Rock Springs Field Office Manager** *in her official caspcity* *also known as* Kimberlee Foster | represented by | **C Levi Martin** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Kimberly Anne Cullen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maggie Baker Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/10/2023 | 1 | PETITION FOR REVIEW filed by Western Watsheds Project, Animal Welfare Institute, Kimerlee Curyl, American Wild Horse Campaign, Carol Walker, Chad Hanson (Filing fee $402 receipt #AWYDC–2256919) (Attachments: # 1 Civil Cover Sheet, # 2 Summons – Stone–Manning, # 3 Summons – Haaland, # 4 Summons – Garland, # 5 Summons – Vassallo) (Schwartz, Leah) (Entered: 05/10/2023) |
| 05/10/2023 | 2 | Notice of Judge Assignment. The case has been assigned to the Honorable Alan B. Johnson with a referral to Magistrate Judge Kelly H. Rankin. (Court Staff, skb) Modified text on 5/11/2023 (Court Staff, sbh). (Entered: 05/10/2023) |
| 05/10/2023 | 3 | Summonses Issued. (Court Staff, skb) (Entered: 05/10/2023) |
| 05/10/2023 | 4 | NOTICE of Attorney Appearance by Leah C Schwartz on behalf of American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watsheds Project (Schwartz, Leah) (Entered: 05/10/2023) |
| 05/10/2023 | 5 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for William S. Eubanks and Matthew R. Arnold to appear pro hac vice; Check not tendered; filed by Petitioners American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watsheds Project. (Attachments: # 1 Affidavit Eubanks, # 2 Affidavit Arnold, # 3 Proposed Order) (Schwartz, Leah) Modified text on 5/10/2023 (Court Staff, sjlg). (Entered: 05/10/2023) |

| 05/11/2023 | 6 | ORDER REASSIGNING CASE. Case reassigned to the Honorable Senior District Judge Nancy D Freudenthal as Presiding Judge for all further proceedings; the Honorable Alan B Johnson is no longer assigned to the case by the Senior District Judge Nancy D Freudenthal.(Court Staff, sjlg) (Entered: 05/11/2023) |
|---|---|---|
| 05/11/2023 | 7 | ORDER by the Honorable Kelly H Rankin granting 5 MOTION for William S. Eubanks and Matthew R. Arnold to appear pro hac vice; Check not tendered; filed by Western Watersheds Project, American Wild Horse Campaign, Kimerlee Curyl, Animal Welfare Institute, Chad Hanson, Carol Walker. Emailed to counsel on 5/12/23 with further instruction.(Court Staff, sal) (Entered: 05/12/2023) |
| 05/15/2023 | 8 | Notice of Pro Hac Vice Attorney Appearance by Matthew R Arnold on behalf of American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watersheds Project Filing fee $ 100, receipt number AWYDC–2258392. (Arnold, Matthew) (Entered: 05/15/2023) |
| 05/15/2023 | 9 | Notice of Pro Hac Vice Attorney Appearance by William S Eubanks, II on behalf of American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watersheds Project Filing fee $ 100, receipt number AWYDC–2258643. (Eubanks, William) (Entered: 05/15/2023) |
| 06/22/2023 | 10 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Intervene, attorney Travis S. Jordan appearing for State of Wyoming, filed by Movant State of Wyoming. (Attachments: # 1 Proposed Order)(Jordan, Travis) (Entered: 06/22/2023) |
| 06/22/2023 | 11 | MEMORANDUM in Support of 10 Motion to Intervene filed by Movant State of Wyoming. (Jordan, Travis) (Entered: 06/22/2023) |
| 06/22/2023 | 12 | NOTICE of Attorney Appearance by Travis Steven Jordan on behalf of State of Wyoming (Jordan, Travis) (Entered: 06/22/2023) |
| 06/22/2023 | 13 | NOTICE of Attorney Appearance by D. David DeWald on behalf of State of Wyoming (DeWald, D. David) (Entered: 06/22/2023) |
| 06/22/2023 | 14 | NOTICE of Attorney Appearance by Shannon Leininger on behalf of State of Wyoming (Leininger, Shannon) (Entered: 06/22/2023) |
| 06/22/2023 | 15 | NOTICE of Attorney Appearance by C Levi Martin on behalf of Bureau of Land Management Director, United States Department of Interior Secretary (Martin, C) (Entered: 06/22/2023) |
| 06/22/2023 | 16 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Maggie B. Smith to appear pro hac vice; Check not tendered; filed by Respondents Bureau of Land Management Director, United States Department of Interior Secretary. (Attachments: # 1 Supplement Declaration of Maggie B. Smith In Support of Motion for Admission Pro Hac Vice, # 2 Proposed Order Granting Motion for Admittance Pro Hac Vice)(Martin, C) (Entered: 06/22/2023) |
| 06/22/2023 | 17 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Kimberly A. Cullen to appear pro hac vice; Check not tendered; filed by Respondents Bureau of Land Management Director, United States Department of Interior Secretary. (Attachments: # 1 Supplement Declaration of Kimberly A. Cullen In Support of Motion for Admission Pro Hac Vice, # 2 Proposed Order Granting Motion for Admittance Pro Hac Vice)(Martin, C) (Entered: 06/22/2023) |
| 06/22/2023 | 18 | |

|  |  | ORDER by the Honorable Kelly H Rankin granting 16 , 17 MOTIONS for Maggie B. Smith and Kimberly A. Cullen to appear pro hac vice on behalf of the Respondents United States Department of Interior Secretary and Bureau of Land Management Director (order emailed to PHV counsel). (Court Staff, stmo) (Entered: 06/22/2023) |
|---|---|---|
| 06/23/2023 | 19 | ORDER by the Honorable Kelly H Rankin granting 10 Motion to Intervene. The State of Wyoming may permissively intervene as a Respondent. (Court Staff, sjdl) (Entered: 06/23/2023) |
| 06/23/2023 | 20 | Notice of Pro Hac Vice Attorney Appearance by Maggie Baker Smith on behalf of Bureau of Land Management Director, United States Department of Interior Secretary (Smith, Maggie) (Entered: 06/23/2023) |
| 06/26/2023 | 21 | Notice of Pro Hac Vice Attorney Appearance by Kimberly Anne Cullen on behalf of Bureau of Land Management Director, United States Department of Interior Secretary (Cullen, Kimberly) (Entered: 06/26/2023) |
| 07/24/2023 | 22 | REQUEST for hearing on Initial Scheduling Conference by Respondents Bureau of Land Management Director, United States Department of Interior Secretary. (Cullen, Kimberly) (Entered: 07/24/2023) |
| 07/25/2023 | 23 | NOTICE of Hearing BY TELEPHONE – All parties shall appear by telephone through the Courts conference call system. Guests call:307/735−3644, Access code 547991460#. **Scheduling Conference set for 8/7/2023 01:30 PM via telephone before Senior District Judge Nancy D Freudenthal.** (Court Staff, sal) (Entered: 07/25/2023) |
| 08/01/2023 | 24 | NOTICE of Attorney Appearance by Danielle Rae Bettencourt on behalf of Rock Springs Grazing Association (Bettencourt, Danielle) (Entered: 08/01/2023) |
| 08/01/2023 | 25 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION for Constance E. Brooks to appear pro hac vice; Check not tendered; filed by Movant Rock Springs Grazing Association. (Attachments: # 1 Affidavit Declaration in Support of Motion for Admission Pro Hac Vice, # 2 Proposed Order)(Bettencourt, Danielle) (Entered: 08/01/2023) |
| 08/02/2023 | 26 | ORDER by the Honorable Kelly H Rankin granting 25 MOTION for Constance E. Brooks to appear pro hac vice on behalf of Movant Rock Springs Grazing Association (order emailed to PHV counsel). (Court Staff, stmo) (Entered: 08/02/2023) |
| 08/02/2023 | 27 | Notice of Pro Hac Vice Attorney Appearance by Constance E Brooks on behalf of Rock Springs Grazing Association Filing fee $ 100, receipt number AWYDC−2292823. (Brooks, Constance) (Entered: 08/02/2023) |
| 08/03/2023 | 28 | NOTICE by Movant Rock Springs Grazing Association *of Motion to Consolidate* (Attachments: # 1 Motion to Consolidate, # 2 Memorandum in Support, # 3 Proposed Order) (Brooks, Constance) (Entered: 08/03/2023) |
| 08/07/2023 | 29 | MINUTES for proceedings held before Senior District Judge Nancy D Freudenthal: Status Conference held on 8/7/2023. (Court Reporter Melanie Sonntag.) (Court Staff, sal) (Entered: 08/07/2023) |
| 08/07/2023 | 30 | (TEXT−ONLY) ORDER by the Senior District Judge Nancy D Freudenthal. Following a telephone conference in this matter on this date, the Court orders that the date for filing of the Administrative Record in this matter is hereby extended to September 5, 2023. Additionally the Court will, on its own initiative, reset the |

| | | |
|---|---|---|
| | | Scheduling Conference in this matter at a later date.(Court Staff, sal) (Entered: 08/07/2023) |
| 08/14/2023 | 31 | MOTION to Consolidate Cases for Trial *(Unopposed)* filed by Respondents Bureau of Land Management Director, United States Department of Interior Secretary. (Attachments: # 1 Proposed Order)(Cullen, Kimberly) (Entered: 08/14/2023) |
| 08/17/2023 | 32 | OPPOSITION to 28 Notice (Other) filed by Respondents Bureau of Land Management Director, United States Department of Interior Secretary. (Attachments: # 1 Exhibit Attachment 1) (Smith, Maggie) (Entered: 08/17/2023) |
| 08/17/2023 | 33 | ORDER by the Senior District Judge Nancy D Freudenthal granting 31 Motion to Consolidate Cases for Administrative Purposes. Any futute filings for Case Nos. 23–CV–87–F or 23–CV–117–F shall be filed in Case No. 23–CV–84–F.(Court Staff, sal) (Entered: 08/17/2023) |
| 08/17/2023 | 34 | OPPOSITION to (28 in 2:23–cv–00084–NDF) Notice (Other) filed by Consolidated Plaintiff Friends of Animals. Associated Cases: 2:23–cv–00084–NDF, 2:23–cv–00087–NDF, 2:23–cv–00117–NDF (Huss, Robert) (Entered: 08/17/2023) |
| 08/18/2023 | 35 | REPLY to (34 in 2:23–cv–00084–NDF) Opposition, (32 in 2:23–cv–00084–NDF) Opposition filed by Movant Rock Springs Grazing Association. Associated Cases: 2:23–cv–00084–NDF, 2:23–cv–00087–NDF, 2:23–cv–00117–NDF (Brooks, Constance) (Entered: 08/18/2023) |
| 09/05/2023 | 36 | NOTICE of Filing Administrative Record by Defendants Bureau of Land Management Director, Bureau of Land Management Rock Springs Field Office Manager, United States Department of the Interior Secretary, Bureau of Land Management, United States Department of Interior Secretary, Respondents Bureau of Land Management Director, United States Department of Interior Secretary (Attachments: # 1 Exhibit 1 (Certification of the Administrative Record)) Associated Cases: 2:23–cv–00084–NDF, 2:23–cv–00087–NDF, 2:23–cv–00117–NDF (Smith, Maggie) 2 USBs containing the Administrative Record received in the Office of the Clerk on 9/5/2023 – 1 delivered to NDF chambers, 1 retained in Clerk's Office. Modified text on 9/5/2023 (Court Staff, stmo). (Entered: 09/05/2023) |
| 09/20/2023 | 37 | MOTION REFERRED TO Judge Kelly H Rankin. Joint MOTION for Extension of Time (Non–Dispositive) requesting extension of deadlines set under Local Rule 83.6(c) filed by Consolidated Defendants Bureau of Land Management, Bureau of Land Management Rock Springs Field Office Manager, Respondents Bureau of Land Management Director, United States Department of Interior Secretary. (Attachments: # 1 Proposed Order)Associated Cases: 2:23–cv–00084–NDF, 2:23–cv–00087–NDF, 2:23–cv–00117–NDF(Smith, Maggie) Unreferred on 9/20/2023 (Court Staff, sal). (Entered: 09/20/2023) |
| 09/20/2023 | | Motions No Longer Referred: (37 in 2:23–cv–00084–NDF) Joint MOTION for Extension of Time (Non–Dispositive) requesting extension of deadlines set under Local Rule 83.6(c) Associated Cases: 2:23–cv–00084–NDF, 2:23–cv–00087–NDF, 2:23–cv–00117–NDF (Court Staff, sal) (Entered: 09/20/2023) |
| 09/20/2023 | 38 | ORDER by the Senior District Judge Nancy D Freudenthal granting (37) Motion for Extension of Time in case 2:23–cv–00084–NDF; granting (39) Motion for Extension of Time in case 2:23–cv–00087–NDF; granting (30) Motion for Extension of Time in case 2:23–cv–00117–NDF. Plaintiff Brief due 1/8/2024. Defendant Brief due by 3/29/2024. Plaintiff Reply Brief due 5/10/2024. Additional deadlines set forth |

| | | herein.Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF(Court Staff, sal) (Entered: 09/20/2023) |
|---|---|---|
| 10/13/2023 | 39 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Compel *a Privilege Log (EXPEDITED CONSIDERATION REQUESTED)* filed by Petitioners American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watersheds Project. (Attachments: # 1 Proposed Order)Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF(Eubanks, William) Modified to terminate on 11/6/2023 (Court Staff, sjlg). (Entered: 10/13/2023) |
| 10/17/2023 | 40 | (TEXT−ONLY) ORDER by the Honorable Kelly H Rankin. Respondents shall respond to Petitioners' Motion to Compel 39 on or before 10/23/2023. Any Reply due by 10/26/2023. Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF(Court Staff, sjdl) Modified on 10/17/2023 (Court Staff, sjdl). (Entered: 10/17/2023) |
| 10/17/2023 | 41 | MOTION REFERRED TO Judge Kelly H Rankin. MOTION to Intervene filed by Movant Rock Springs Grazing Association. (Attachments: # 1 Proposed Order)Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF(Brooks, Constance) (Entered: 10/17/2023) |
| 10/17/2023 | 42 | MEMORANDUM in Support of (41 in 2:23−cv−00084−NDF) Motion to Intervene filed by Movant Rock Springs Grazing Association. (Attachments: # 1 Affidavit Declaration of John W. Hay III (with attachments)) Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF (Brooks, Constance) (Entered: 10/17/2023) |
| 10/18/2023 | 43 | ORDER by the Honorable Kelly H Rankin granting (41) Motion to Intervene in case 2:23−cv−00084−NDF. Rock Springs Grazing Association may permissively intervene. Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF(Court Staff, sjdl) (Entered: 10/18/2023) |
| 10/23/2023 | 44 | RESPONSE in Opposition re (39 in 2:23−cv−00084−NDF) MOTION to Compel *a Privilege Log (EXPEDITED CONSIDERATION REQUESTED)* filed by Consolidated Defendants Bureau of Land Management, Bureau of Land Management Rock Springs Field Office Manager, Respondents Bureau of Land Management Director, United States Department of Interior Secretary. Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF (Smith, Maggie) (Entered: 10/23/2023) |
| 10/26/2023 | 45 | REPLY to (44 in 2:23−cv−00084−NDF) Response in Opposition to Motion, filed by Petitioners Kimerlee Curyl, Chad Hanson. Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF (Eubanks, William) (Entered: 10/26/2023) |
| 10/30/2023 | 46 | ORDER by the Honorable Kelly H Rankin denying (39) Motion to Compel in case 2:23−cv−00084−NDF. Plaintiffs have not demonstrated a need for a privilege log. Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF(Court Staff, sjdl) (Entered: 10/30/2023) |
| 11/20/2023 | 47 | SUPPLEMENT re (36 in 2:23−cv−00084−NDF) Notice of Filing Administrative Record, filed by Consolidated Defendants Bureau of Land Management, Bureau of Land Management Rock Springs Field Office Manager, Respondents Bureau of Land Management Director, United States Department of Interior Secretary. Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF (Court |

| | | Staff, stmo). 2 USBs containing the supplement to the Administrative Record received in the Office of the Clerk on 11/20/2023 – 1 delivered to NDF chambers, 1 retained in Clerk's Office. Modified text on 11/20/2023 (Court Staff, stmo). (Entered: 11/20/2023) |
|---|---|---|
| 11/20/2023 | 48 | NOTICE of Filing Administrative Record by Defendants Bureau of Land Management Director, Bureau of Land Management Rock Springs Field Office Manager, United States Department of the Interior Secretary, Bureau of Land Management, United States Department of Interior Secretary, Consolidated Defendants Bureau of Land Management, Bureau of Land Management Rock Springs Field Office Manager, Respondents Bureau of Land Management Director, United States Department of Interior Secretary (Attachments: # 1 Exhibit 1) Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF (Cullen, Kimberly) (Entered: 11/20/2023) |
| 01/08/2024 | 49 | *OPENING* BRIEF filed by Consolidated Plaintiffs Meg Frederick, Angelique Rea, Return to Freedom. (Attachments: # 1 Exhibit WY RTF Hilary Wood standing declaration, # 2 Exhibit WY RTF Meg Frederick standing declaration, # 3 Exhibit WY RTF Neda Demayo standing declaration, # 4 Exhibit WY RTF Angelique Rea standing declaration) Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF (Emery, Stephenson) (Entered: 01/08/2024) |
| 01/08/2024 | 50 | *Opening* BRIEF filed by Consolidated Plaintiff Friends of Animals. (Attachments: # 1 Exhibit Declaration of Craig C. Downer) Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF (Best, Jennifer) (Entered: 01/08/2024) |
| 01/08/2024 | 51 | *Opening Merits* BRIEF filed by Petitioners American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watersheds Project. (Attachments: # 1 Exhibit A: Declaration of Carol Walker, # 2 Exhibit B: Declaration of Suzanne Roy, # 3 Exhibit C: Applicable NEPA Regulations) Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF (Eubanks, William) (Entered: 01/08/2024) |
| 03/19/2024 | 52 | ORDER REASSIGNING CASE by the Honorable Scott W. Skavdahl. Case reassigned to District Judge Kelly H. Rankin for all further proceedings; Senior District Judge Nancy D. Freudenthal no longer assigned to cased.(Court Staff, szf)Associated Cases: 2:23−cv−00084−NDF, 2:23−cv−00087−NDF, 2:23−cv−00117−NDF(Court Staff, szf) (Entered: 03/19/2024) |
| 03/25/2024 | 53 | (TEXT−ONLY) NOTICE of Scheduling Conference: BY TELEPHONE – All parties shall appear by telephone through the Court's conference call system. Guests call: 307−735−3644 Conference ID: 275 440 149#. Parties should have their calendars on hand for scheduling. **Scheduling Conference set for 4/11/2024 at 10:00 AM before District Judge Kelly H Rankin.** Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Court Staff, smxb) (Entered: 03/25/2024) |
| 03/29/2024 | 54 | RESPONSE to (50 in 2:23−cv−00084−KHR) Brief, (49 in 2:23−cv−00084−KHR) Brief, (51 in 2:23−cv−00084−KHR) Brief, filed by Consolidated Defendants Bureau of Land Management, Bureau of Land Management Rock Springs Field Office Manager, Respondents Bureau of Land Management Director, United States Department of Interior Secretary. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Smith, Maggie) (Entered: 03/29/2024) |
| 04/04/2024 | 55 | RESPONSE to (50 in 2:23−cv−00084−KHR) Brief, (49 in 2:23−cv−00084−KHR) Brief, (51 in 2:23−cv−00084−KHR) Brief, *in Opposition* filed by Intervenor |

| | | Respondent State of Wyoming. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Jordan, Travis) (Entered: 04/04/2024) |
|---|---|---|
| 04/05/2024 | 56 | RESPONSE to (50 in 2:23−cv−00084−KHR) Brief, (49 in 2:23−cv−00084−KHR) Brief, (51 in 2:23−cv−00084−KHR) Brief, filed by Intervenor Respondent Rock Springs Grazing Association. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Brooks, Constance) (Entered: 04/05/2024) |
| 04/11/2024 | 57 | MINUTES for proceedings held before District Judge Kelly H Rankin: After discussion with parties, Court will schedule an oral argument in the related cases 23−cv−84, 23−cv−87, and 23−cv−117 for 6/11/24 at 10:00 AM. The Court will also vacate the current setting of an oral argument on 5/9/24 in 23−cv−48 and reschedule it for 6/11/24 at 2:00 PM. Scheduling Conference held on 4/11/2024. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Court Staff, smxb) (Entered: 04/11/2024) |
| 04/11/2024 | 58 | (TEXT−ONLY) NOTICE of Hearing: IN−PERSON **Oral Argument Hearing set for 6/11/2024 at 10:00 AM in Cheyenne Courtroom No. 3 (Room No. 2104) before District Judge Kelly H Rankin. Nonparticipating counsel of record ONLY, who wish to appear via video, shall contact the Courtroom Deputy (miyon_bowden@wyd.uscourts.gov) on or before June 7, 2024.** Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Court Staff, smxb) (Entered: 04/11/2024) |
| 04/16/2024 | 59 | MOTION to Vacate June 11, 2024 Oral Argument (and reset to July 9 or July 16) filed by Petitioners American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watersheds Project. (Attachments: # 1 Proposed Order)Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR(Eubanks, William) (Entered: 04/16/2024) |
| 04/16/2024 | 60 | ORDER by the District Judge Kelly H Rankin granting (59) Motion to Vacate in case 2:23−cv−00084−KHR; granting (61) Motion to Vacate in case 2:23−cv−00087−KHR; granting (52) Motion to Vacate in case 2:23−cv−00117−KHR. **Oral Argument Hearing reset for 7/16/2024 at 10:00 AM in Cheyenne Courtroom No. 3 (Room No. 2104) before District Judge Kelly H Rankin. Nonparticipating counsel of record ONLY, who wish to appear via video, shall contact the Courtroom Deputy (miyon_bowden@wyd.uscourts.gov) on or before July 12, 2024.** Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR(Court Staff, smxb) (Entered: 04/16/2024) |
| 05/10/2024 | 61 | REPLY BRIEF re (56 in 2:23−cv−00084−KHR) Response, (55 in 2:23−cv−00084−KHR) Response, (54 in 2:23−cv−00084−KHR) Response, filed by Consolidated Plaintiff Friends of Animals. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Best, Jennifer) (Entered: 05/10/2024) |
| 05/10/2024 | 62 | REPLY re (56 in 2:23−cv−00084−KHR) Response, (55 in 2:23−cv−00084−KHR) Response, (54 in 2:23−cv−00084−KHR) Response filed by Petitioners American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watersheds Project. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Eubanks, William) Modified to link on 5/16/2024 (Court Staff, smxb). (Entered: 05/10/2024) |
| 06/13/2024 | 63 | NOTICE by Petitioners American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watersheds Project re (64 in |

| | | |
|---|---|---|
| | | 2:23−cv−00087−KHR, 62 in 2:23−cv−00084−KHR, 55 in 2:23−cv−00117−KHR) Reply, (Attachments: # 1 Exhibit BLM's June 7, 2024 Scoping Statement) Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Eubanks, William) (Entered: 06/13/2024) |
| 06/18/2024 | 64 | ORDER Requesting Additional Briefing by the District Judge Kelly H Rankin, re: (63 in 2:23−cv−00084−KHR) Notice by Petitioners Western Watersheds Project, American Wild Horse Campaign, Kimerlee Curyl, Animal Welfare Institute, Chad Hanson, Carol Walker. Unless otherwise requested, parties shall collectively submit their respective briefing by June 28, 2024. Unless otherwise requested, each parties' respective briefs shall be limited to ten (10) pages in length. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR(Court Staff, smxb) (Entered: 06/18/2024) |
| 06/27/2024 | 65 | NOTICE and MOTION for Leave to File Reply Brief by Plaintiffs Meg Frederick, Front Range Equine Rescue, Angelique Rea, Return to Freedom *Notice of Misfiling RTF Plaintiffs' Reply Brief and Request for Leave to File Brief Herein* Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Emery, Stephenson) Modified to correct filing event and edit docket text on 6/28/2024 (Court Staff, smxb). (Entered: 06/27/2024) |
| 06/28/2024 | 66 | (TEXT−ONLY) ORDER by the District Judge Kelly H Rankin granting (65) Motion to File Reply/Brief/Supplement in case 2:23−cv−00084−KHR. IT IS ORDERED that Plaintiffs shall file their reply brief in the lead case (2:23−cv−00084−KHR) within three business days. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR(Court Staff, smxb) (Entered: 06/28/2024) |
| 06/28/2024 | 67 | REPLY BRIEF filed by Consolidated Plaintiff Return to Freedom. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Emery, Stephenson) (Entered: 06/28/2024) |
| 06/28/2024 | 68 | RESPONSE to (64 in 2:23−cv−00084−KHR, 64 in 2:23−cv−00084−KHR, 64 in 2:23−cv−00084−KHR) Order,,,,,,,, filed by Intervenor Respondent Rock Springs Grazing Association. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Brooks, Constance) (Entered: 06/28/2024) |
| 06/28/2024 | 69 | RESPONSE to (64 in 2:23−cv−00084−KHR, 64 in 2:23−cv−00084−KHR, 64 in 2:23−cv−00084−KHR) Order,,,,,,,, *Brief in Response* filed by Intervenor Respondent State of Wyoming. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Jordan, Travis) (Entered: 06/28/2024) |
| 06/28/2024 | 70 | RESPONSE to (64 in 2:23−cv−00084−KHR, 64 in 2:23−cv−00084−KHR, 64 in 2:23−cv−00084−KHR) Order,,,,,,,, filed by Consolidated Defendants Bureau of Land Management, Bureau of Land Management Rock Springs Field Office Manager, Respondents Bureau of Land Management Director, United States Department of Interior Secretary. (Attachments: # 1 Exhibit 1 (Declaration of Kimberlee Foster)) Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Smith, Maggie) (Entered: 06/28/2024) |
| 06/28/2024 | 71 | RESPONSE to (64 in 2:23−cv−00084−KHR, 64 in 2:23−cv−00084−KHR, 64 in 2:23−cv−00084−KHR) Order,,,,,,,, *ON BEHALF OF ALL PETITIONERS* filed by Petitioners American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watersheds Project. Associated Cases: 2:23−cv−00084−KHR, 2:23−cv−00087−KHR, 2:23−cv−00117−KHR (Eubanks, |

| | | William) (Entered: 06/28/2024) |
|---|---|---|
| 07/08/2024 | 72 | NOTICE by Petitioners American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watersheds Project re (62 in 2:23–cv–00084–KHR, 64 in 2:23–cv–00087–KHR, 55 in 2:23–cv–00117–KHR) Reply, (67 in 2:23–cv–00084–KHR, 60 in 2:23–cv–00117–KHR, 69 in 2:23–cv–00087–KHR) Reply Brief, (61 in 2:23–cv–00084–KHR, 63 in 2:23–cv–00087–KHR, 54 in 2:23–cv–00117–KHR) Reply Brief, *NOTICE OF SUPPLEMENTAL AUTHORITY* (Attachments: # 1 Exhibit Loper Bright Enterprises v. Raimondo) Associated Cases: 2:23–cv–00084–KHR, 2:23–cv–00087–KHR, 2:23–cv–00117–KHR (Eubanks, William) (Entered: 07/08/2024) |
| 07/12/2024 | 73 | (TEXT–ONLY) ORDER by the District Judge Kelly H Rankin. The Court has allocated 90 minutes for the oral argument hearing on July 16, 2024. Each side shall collectively have 45 minutes to present their arguments. Counsel may determine among individual parties/intervenors how the time should be allocated. Associated Cases: 2:23–cv–00084–KHR, 2:23–cv–00087–KHR, 2:23–cv–00117–KHR(Court Staff, sjdl) (Entered: 07/12/2024) |
| 07/12/2024 | 74 | RESPONSE to (72 in 2:23–cv–00084–KHR) Notice (Other),, *of Supplemental Authority* filed by Consolidated Defendants Bureau of Land Management, Bureau of Land Management Rock Springs Field Office Manager, Respondents Bureau of Land Management Director, United States Department of Interior Secretary. Associated Cases: 2:23–cv–00084–KHR, 2:23–cv–00087–KHR, 2:23–cv–00117–KHR (Smith, Maggie) (Entered: 07/12/2024) |
| 07/15/2024 | 75 | (TEXT–ONLY) NOTICE Resetting Hearing (**COURTROOM CHANGE ONLY**): IN–PERSON **Oral Argument hearing reset for 7/16/2024 at 10:00 AM in Cheyenne Courtroom No. 1 (Room No. 2132) before District Judge Kelly H Rankin.** Associated Cases: 2:23–cv–00084–KHR, 2:23–cv–00087–KHR, 2:23–cv–00117–KHR (Court Staff, smxb) (Entered: 07/15/2024) |
| 07/16/2024 | 76 | MINUTES for proceedings held before District Judge Kelly H Rankin: Court heard oral arguments on the petition that was originally filed by the petitioners in this matter. Court will take all arguments into consideration and provide guidance to parties. Oral Argument Hearing held on 7/16/2024. (Court Reporter Jan Davis.) Associated Cases: 2:23–cv–00084–KHR, 2:23–cv–00087–KHR, 2:23–cv–00117–KHR (Court Staff, smxb) (Entered: 07/16/2024) |
| 08/01/2024 | 77 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Oral Argument Proceedings held on 7/16/2024 before Judge Kelly H. Rankin. To purchase a copy of this transcript, please contact Court Reporter Jan Davis, phone (307) 433–2154 or email jbd.davis@gmail.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 8/8/2024. Notice of Redaction Request due 8/22/2024. Redacted Transcript Deadline set for 9/3/2024. Release of Transcript Restriction set for 10/30/2024. Associated Cases: 2:23–cv–00084–KHR, 2:23–cv–00087–KHR, 2:23–cv–00117–KHR (Davis, Jan) (Entered: 08/01/2024) |
| 08/01/2024 | 78 | MOTION to Withdraw as Attorney filed by Consolidated Plaintiff Friends of Animals. Associated Cases: 2:23–cv–00084–KHR, 2:23–cv–00087–KHR, 2:23–cv–00117–KHR(Huss, Robert) (Entered: 08/01/2024) |
| 08/02/2024 | 79 | |

| | | |
|---|---|---|
| | | (TEXT–ONLY) ORDER by the District Judge Kelly H Rankin granting (78) Motion to Withdraw as Attorney. Attorney Robert Huss terminated in case 2:23–cv–00084–KHR Associated Cases: 2:23–cv–00084–KHR, 2:23–cv–00087–KHR, 2:23–cv–00117–KHR(Court Staff, sjgc) (Entered: 08/02/2024) |
| 08/14/2024 | 80 | ORDER by the District Judge Kelly H Rankin, re (36 in 2:23–cv–00084–KHR) Notice of Filing Administrative Record. IT IS HEREBY ORDERED that BLMs May 6, 2023, ROD is AFFIRMED. The Court concludes that Petitioners lack an actionable claim under the Administrative Procedures Act. 5 U.S.C. § 706(2)(A). Associated Cases: 2:23–cv–00084–KHR, 2:23–cv–00087–KHR, 2:23–cv–00117–KHR(Court Staff, smxb) (Entered: 08/14/2024) |
| 08/14/2024 | 81 | FINAL JUDGMENT in favor of Respondent by the District Judge Kelly H Rankin. IT IS HEREBY ORDERED AND ADJUDGED that Petitioners fail to establish that BLMs actions were arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, nor that they were in excess of statutory jurisdiction, authority, limitations, or short of statutory right. 5 U.S.C. § 706(2)(A), (C). Accordingly, BLMs Resource Management Plan Amendment and corresponding May 6, 2023 Record of Decision is UPHELD AND AFFIRMED. Associated Cases: 2:23–cv–00084–KHR, 2:23–cv–00087–KHR, 2:23–cv–00117–KHR(Court Staff, smxb) Modified text on 8/14/2024 (Court Staff, smxb). (Entered: 08/14/2024) |
| 08/16/2024 | 82 | NOTICE OF APPEAL as to 80 in 2:23–cv–00084–KHR and Final Judgment 81 in 2:23–cv–00084–KHR) filed by Petitioners American Wild Horse Campaign, Animal Welfare Institute, Kimerlee Curyl, Chad Hanson, Carol Walker, Western Watersheds Project. (Arnold, Matthew) Modified text on 8/16/2024 (Court Staff, stbd). (Entered: 08/16/2024) |

**FILED**

1:18 pm, 8/14/24

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

_____

AMERICAN WILD HORSE
CAMPAIGN; ANIMAL WELFARE
INSTITUTE; WESTERN
WATERSHEDS PROJECT; CAROL
WALKER; CHAD HANSON; and
KIMERLEE CURYL,

        Petitioners,

vs.

TRACY STONE-MANNING, Bureau of
Land Management Director, in her official
capacity; and DEB HAALAND, Secretary
of the Department of the Interior, in her
official capacity,

        Respondents,

    and

STATE OF WYOMING; and ROCK
SPRINGS GRAZING ASSOCIATION, a
Wyoming corporation,

        Respondent-Intervenors.

Civil Nos.  23-CV-84-KHR (Lead)
                23-CV-87-KHR (Joined)
                23-CV-117-KHR (Joined)

RETURN TO FREEDOM, a nonprofit
organization; FRONT RANGE EQUINE
RESCUE, a nonprofit organization; MEG
FREDERICK; and ANGELIQUE REA,

        Petitioners,

vs.

DEB HAALAND, Secretary of the
Department of the Interior, in her official
capacity; TRACY STONE-MANNING,
Bureau of Land Management Director, in
her official capacity; and KIMBERLEE
FOSTER, Bureau of Land Management
Rock Springs Field Office Manager, in her
official capacity,

    Respondents.

---

FRIENDS OF ANIMALS, a 501(c)(3)
organization,

    Petitioner,

  vs.

DEB HAALAND, Secretary of the
Department of the Interior, in her official
capacity; and BUREAU OF LAND
MANAGEMENT,

    Respondents.

---

## ORDER AFFIRMING AGENCY ACTION

This matter comes before the Court under the Administrative Procedure Act (APA)

for judicial review of the actions of the Bureau of Land Management (BLM), a division

within the Department of the Interior (DOI), which are contested in three separate actions.

The administrative record has been submitted and supplemented (ECF No. 36, 47, 48); the

parties have fully briefed the issues and provided exhibits (ECF Nos. 49, 50, 51, 54, 55,

56, 61, 62, 67); and the parties have presented oral arguments on the matter. [ECF No. 76].

Having considered the parties' arguments and reviewed the record, the Court finds the challenged agency actions must be AFFIRMED.

## BACKGROUND

This case is yet another in a history as byzantine as the land to which it pertains. For the sake of brevity, the Court incorporates by reference the factual background and legal background of the WHA in its Order Affirming Agency Action and Denying Mandamus Relief in *Rock Springs Grazing Association v. U.S. Department of the Interior et al.*, 23-CV-00048-KHR. Notwithstanding, what follows is a summary of that relevant history and pertinent law.

### A.  *Legal Background*

1.  <u>The Federal Land Policy and Management Act</u>.

There are three relevant acts of Congress which must be detailed. The first of which being the Federal Land Policy and Management Act (FLPMA). 43 U.S.C. §§ 1701 *et seq.* BLM manages public lands pursuant to FLPMA, which directs the former to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans" developed by the agency. 43 U.S.C. § 1732(a).

Under FLPMA, BLM prepares land use plans—also known as "resource management plans," or "RMPs"—that provide management direction for public lands. 43 C.F.R. § 1601.0-5(n); *see also* 43 U.S.C. § 1712(a). RMPs may be amended for, *inter alia*, "a change in circumstances." 43 C.F.R. § 1610.5-5. Such amendments are "made through an environmental assessment of the proposed change, or an environmental impact statement [EIS], if necessary," and include a public participation requirement. *Id.*; *see also*

3

43 C.F.R. § 1610.2. Crucially, BLM is required to manage public lands consistent with their respective RMPs. 43 C.F.R. §§ 1610.5-3(a), 4710.1.

       2.     <u>The Wild Free-Roaming Horses and Burros Act</u>.

Turning to the next pertinent act, in 1971, Congress enacted the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331 *et seq.* (otherwise known as the "Wild Horses Act" and hereinafter as the "WHA"), with the explicit recognition that "wild free-roaming horses and burros. . . belong to no one individual. They belong to all the American people." S. Rep. No. 92-242 (1971), *reprinted in* 1971 U.S.C.C.A.N. 2149. Seeking to protect a living spirit of the American West, the WHA directs the Secretary of the Interior to provide for the protection and management of these animals. 16 U.S.C. § 1333.

BLM administers the WHA as the Secretary's delegate. In doing so, the WHA provides BLM with "a high degree of discretionary authority" to manage horses. H.R. Rep. No. 92-681, at 6–7 (1971), *reprinted in* 1971 U.S.C.C.A.N. 2159, 2160. The WHA separately requires that BLM's "management activities shall be at the minimal feasible level." 16 U.S.C. § 1333(a). Despite such language, administration of the WHA tends to be a complex and often fact specific endeavor.

For example, the WHA sets forth statutory requirements for managing horses on both public and private lands. These statutory requirements being Sections 3 and 4 of the WHA. *See* 16 U.S.C. §§ 1333–34. Crucially, the obligations imposed upon BLM differ if the land in question is public or private. Sometimes, the result of these two differing

4

obligations, as seen at the heart of this matter, can be difficult for BLM to navigate—a statutory Scylla and Charybdis.[1]

For public lands, Section 3 of the WHA (16 U.S.C. § 1333) directs the Secretary of the Interior to manage wild horses "to achieve and maintain a thriving natural ecological balance [TNEB] on the public lands." 16 U.S.C. § 1333(a). As the Secretary's delegate, BLM "carries out this function in localized 'herd management areas' [HMAs]." *Fund for Animals v. BLM*, 460 F.3d 13, 15 (D.C. Cir. 2006). BLM establishes HMAs in accordance with broader land-use plans. *Id.* In each HMA, BLM is afforded significant discretion to compute "appropriate management levels" ("AMLs") for wild horse populations they manage. *Id.* at 16. Importantly, BLM may not include any forage or water that exists on private lands in their calculation of an AWL without the landowner's written permission. *See* A.R. RMPA-049480. Separately, "herd areas" ("HAs"), defined as the geographic area used by a "herd as its habitat in 1971" are managed with the objective of limiting wild horse use. 43 C.F.R. §§ 4700.0-5(d), 4710.4. BLM manages such HAs "at the minimum level necessary to attain the objectives identified in approved land use plans." 43 C.F.R. § 4710.4. The "AML of a given HA is typically zero." *Western Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1274 n.5 (D. Utah 2017).

Section 3 also requires that BLM, if they determine there is an overpopulation of wild horses on public lands and that action is necessary to remove these excess animals, to "immediately remove excess animals from the range so as to achieve [AMLs]." 16 U.S.C.

---

[1] In more contemporary terms, we call this being "between a rock and a hard place."

§ 1333(b)(2). The WHA gives BLM broad discretion as to how it may manage and remove wild horses from public lands. *See* 16 U.S.C. § 1333(b)(1); *see also American Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1317–18 (D.C. Cir. 1982). Such removal actions are conducted after BLM develops and finalizes a "gather plan," which sets forth the number of horses to be gathered and the methods by which they will be gathered. *See* A.R. RMPA-001213.

By contrast, Section 4 of the WHA governs management of horses on private lands. 16 U.S.C. § 1334. Section 4 provides that owners of private land, when faced with wild horses on their lands, "may inform [BLM], who shall arrange to have the animals removed." *Id.* Upon receiving such a request, applicable regulations dictate that BLM must "remove stray wild horses [] from private lands as soon as practicable." 43 C.F.R. § 4720.2-1. As wild horses cannot be removed or destroyed by private persons, such request under Section 4 is the only relief available to non-consenting private landowners. 43 C.F.R. § 4730.1; 16 U.S.C. §§ 1334, 1338.

### 3. The National Environmental Policy Act.

The last of the three pertinent acts, the National Environmental Policy Act (NEPA) requires federal agencies to prepare an EIS to analyze the environmental impacts of major federal actions expected to "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C)(ii). NEPA was enacted "to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Colorado Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1209 (10th Cir. 2006). NEPA establishes the procedures by which

6

federal agencies must consider the environmental impacts of their actions, but it does not dictate the substantive results. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Separately, the Council on Environmental Quality (CEQ) oversees NEPA and promulgates regulations that are binding upon federal agencies. *Colorado Wild*, 435 F.3d at 1209. These regulations provide guidance on the implementation of NEPA. 40 C.F.R. §§ 1500–08; *see Robertson*, 490 U.S. at 355–56.

**B.    Factual Background**

   1.    The Wyoming Checkerboard.

Over a century ago, in an area originally patented under the Union Pacific Railroad Land Grant in southwest Wyoming, the Rock Springs Grazing Association (RSGA) formed to assemble the land rights to use rangeland resources in an area now called the "Wyoming Checkerboard" (hereinafter the "Checkerboard"). *Rock Springs Grazing Ass'n (RSGA) v. Salazar*, 935 F. Supp. 2d 1179, 1182 (D. Wyo. 2013). The aptly named Checkerboard is a strip of land—roughly 40 miles wide and 80 miles long, totaling 3,200 square miles or about two million acres—which is divided into one-mile square sections of interchanging owners, both public and private lands. *Id.* The Checkerboard is generally described as high desert, with limited forage, limited fences, and sensitive to overuse—a delicate ecological balance. *Id.* at 1182–83. RSGA owns and leases about 1.1 million acres of private land within this area, with such lands being the odd-numbered sections. *Id.* at 1182. Alongside additional private owners, there is a high amount of public land contained within the Checkerboard. Those public lands are managed by the BLM, which does so as the delegate

7

for the Secretary of the Interior. The ownership may change every square mile, but each parcel shares a unique and important characteristic: wild horses freely roam in and between them.

For over half a century since the enactment of the WHA, RSGA and BLM have fluctuated between cooperation and conflict in how the latter manages the lands and the wild horses which roams upon those lands.[2] Crucially, a consent decree was entered in 1979, whereby BLM, with the consent of RSGA, designated four HMAs for the Rock Springs District of the Checkerboard, with the following AMLs: (1) Great Divide Basin HMA: 415–600 horses; (2) White Mountain HMA: 205–300 horses; (3) Salt Wells Creek HMA: 251–365 horses; and (4) Adobe Town HMA (Rock Springs Field Office portion): 165–235 horses. A.R. RMPA-001228.

Later, in 2003, the State of Wyoming sued BLM to compel the latter to conduct gathers to achieve AMLs for each of the four HMAs. *See American Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1180–81 (10th Cir. 2016). The result was a consent decree between Wyoming and BLM, whereby the latter was required to remove excess horses under Section 3 of the WHA within a limited period and gather horses in each HMA every three years to the lower level of their AMLs. *Id.*

BLM's efforts stalled, prompting RSGA to revoke its consent under Section 4 in 2010. *Id.* In short, litigation between RSGA and BLM resulted in the 2013 Consent Decree (hereinafter the "Consent Decree"). *Id.* Although ultimately approved, three intervenors in

---

[2] As stated before, for a more searching explanation of the history between RSGA and BLM, refer to the background section of the Court's Order Affirming Agency Action and Denying Mandamus Relief in *Rock Springs Grazing Association et al. v. United States Department of Interior et al.*, 23-CV-00048-KHR.

that action, including Petitioner American Wild Horse Campaign (AWHC), objected to the entry of the Consent Decree in district court. *See RSGA v. Salazar*, 935 F. Supp. 2d at 1181, 1185.

Ultimately being approved by this Court, the Consent Decree included several pertinent provisions. *See id.* at 1192–94 (listing various agreements between parties to Consent Decree). Under the Consent Decree, BLM agreed to remove all wild horses located on RSGA's private lands, including Checkerboard lands except for those in the White Mountain HMA, which would have a set AML of 205–300 wild horses and be subject to excess removal if necessary. *Id.* at 1192. No later than November 30 of each year during the Consent Decree, BLM agreed to report to RSGA on the results of wild horse censuses for various HMAs and provide notice for gathers to remove wild horses. *Id.* at 1193. Paragraph 4 of the Consent Decree also included agreed-upon courses of action based on the results of any census and accompanying projected reproduction rates. *Id.* Meanwhile, paragraph 5 committed BLM to gather and remove wild horses on a set timetable for each HMA over the subsequent years. *Id.*

Lastly, of those pertinent provisions, paragraph 6 of the Consent Decree stipulated that BLM would commit to embarking on amending the RMPs for the Rock Springs and Rawlins Field Offices. *Id.* In doing so, BLM committed to considering several proposed actions. *Id.* The first two being to change the Salt Wells HMA and Divide Basin HMA to Herd Areas, to be managed for zero wild horses and if more than 200 and 100 wild horses were present on each, respectively, they would be re-gathered. *Id.* The third would change the Adobe Town HMA AML to 225–450 wild horses or lower, with gathered wild horses

9

not to be returned to the Salt Wells area. *Id.* The fourth proposed action would manage the White Mountain HMA as a non-reproducing herd, utilizing fertility control and sterilization methods, to maintain 205 wild horses and initiate gathers if the population exceeded 205. *Id.* The Consent Decree separately contained provisions for modification and termination, with the latter to occur "no later than 10 years after entry of the decree, subject to the right of the parties to negotiate an extension." *Id.* at 1194.

In accordance with the Consent Decree, BLM conducted a gather in 2013, bringing the Salt Wells Creek and Adobe Town HMAs to low AML levels. *American Wild Horse Pres. Campaign*, 847 F.3d at 1181. RSGA and Wyoming objected to BLM leaving any horses on the Checkerboard, and BLM agreed. *Id.* at 1182. Pursuant to its gather plan, BLM then conducted a gather in 2014 that removed 1,263 horses in the Great Divide Basin, Adobe Town, and Salt Wells HMAs. *Id.*

In response to that gather, BLM was sued by wild horse advocates who alleged that BLM's removal during the 2014 gather violated the WHA, FLPMA, NEPA, and BLM's RMPs. *Id.* at 1186. In *American Wild Horse Preservation Campaign (AWHPC) v. Jewell*, several petitioners—some of whom are Petitioners in this action—sought "review of, and relief from, BLM's decision to permanently remove more than 1,200 wild horses from certain areas of the Wyoming Checkerboard[.]" 2015 WL 11070090, at *1 (D. Wyo. Mar. 3, 2015). As is the case here, those petitioners argued that BLM's actions constituted an ongoing violation of the WHA, FLPMA, and NEPA. Ultimately, this Court upheld BLM's actions under the WHA and FLPMA but remanded to BLM under NEPA. *AWHPC v. Jewell*, 2015 WL 11070090, at *11.

10

Petitioners appealed and the Tenth Circuit reversed this Court's decision. *See American Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174 (10th Cir. 2016). In doing so, the Tenth Circuit acknowledged the unique nature of the Checkerboard and the free-roaming nature of wild horses, but in recognizing the complexity of the disputes noted that the need for a workable solution would ultimately need to come from Congress. *Id.* at 1189 n.8. Notwithstanding this recognition, and in overruling this Court's decision, the Tenth Circuit clarified that when BLM scheduled a Section 4 removal of wild horses to meet the demands of RSGA, gathers conducted on the Checkerboard were required to be conducted in accordance with both Sections 3 and 4 of the WHA due to the interlocking public and private lands. *Id.* at 1186. By contrast, to remove wild horses from the Checkerboard to *completely* meet RSGA's demands, the Tenth Circuit further noted that BLM would need to engage in a management plan amendment process under FLPMA, to properly modify HMAs to Herd Areas. *Id.*

2. Rock Springs and Rawlins Field Offices' Resource Management Plans Amendment.

In accordance with the Consent Decree, BLM began a process to "resolve the issues associated with managing wild horses on checkerboard land without the permissive use of private land." A.R. RMPA-001191. In accordance with FLPMA, BLM initiated a planning effort to amend the Rock Springs and Rawlins Field Offices' RMPs for managing wild horses. A.R. RMPA-001181. BLM defined the purpose of the planning effort as "to identify and select, consistent with applicable law, a plan for wild horse management, including AML, on the current HMAs that include checkerboard land." A.R. RMPA-

11

001193. Separately, BLM defined the need for the amendment as "driven by the checkerboard pattern of public and private land ownership within the HMAs, the requirements of the [WHA], [and] RSGA's withdrawal of consent to maintain wild horses on privately owned lands." *Id.* To meet this purpose and need, and to comply with the WHA and the Tenth Circuit, BLM considered amendments to the RMPs that would allow it to decide which lands within the HMAs should continue to be managed as HMAs. *Id.*

Consistent with FLPMA and NEPA, BLM prepared an EIS. The draft RMP Amendment and EIS were made available for public comment in January 2020. A.R. RMPA-001007. After the public comment period, the proposed RMP Amendment and Final EIS were published in March 2022. A.R. RMPA-001178. Of the four alternatives proposed, BLM selected Alternative D for the proposed RMP Amendment. A.R. RMPA-001202, RMPA-001667.

On May 8, 2023, BLM published its Record of Decision (ROD) enacting the RMP Amendment. A.R. RMPA-001659. BLM explained its bases for selecting Alternative D in meeting its stated purpose and need, as well as the effects upon the environment and interests. A.R. RMPA-001202, RMPA-001677. In brief, the Great Divide Basin and Salt Wells Creek HMAs were entirely reverted to HA status, all areas of the Adobe Town HMA that included Checkerboard lands would also revert to HA status, and there were no changes in either status or AML to the White Mountain HMA. A.R. RMPA-001202, RMPA-001677–79, RMPA-043810. BLM also explained why Alternatives A–C were not selected. *See* A.R. RMPA-001680. As a result, BLM approved the selection of Alternative

12

D and amended the RMPs. A.R. RMPA-001659. Petitioners were not content with the outcome of this process, thus leading to the instant action.

<h2 align="center">STANDARD OF REVIEW</h2>

Where a statute does not include a private right of action, the APA may provide for judicial review of agency actions. *Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998); 5 U.S.C. § 704. The APA authorizes a court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, [] otherwise not in accordance with law" or if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) (first quotation); 5 U.S.C. § 706(2)(C) (second quotation). "Reviews of agency action in the district courts [under the APA] must be processed as appeals. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994).

The APA's standard of review is "highly deferential." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008). A court may not vacate an agency's decision unless that agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Where a court is reviewing scientific judgments and technical analyses within the agency's expertise, deference to agency expertise is especially merited. *Id.* at 824; *see*

13

*also Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983). Nonetheless, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation omitted).[3]

<u>DISCUSSION</u>

The road that lay before the Court is long and winding yet ends in finding that BLM has not acted arbitrarily and capriciously or otherwise not in accordance with law. The first step in this journey is to decipher whether Petitioners' claims are ripe for adjudication and if said Petitioners have standing to bring their claims. Faced with that inquiry, the Court finds that some of Petitioners' claims are ripe and that they have standing to bring those claims, but only insofar as their claims allege procedural violations of the WHA, FLPMA, and/or NEPA.

From there begins the Court's foray into the WHA. Petitioners levy a litany of contentions alleging that BLM acted arbitrarily and capriciously or otherwise not in accordance with law as it relates to the WHA. Ultimately, however, the Court finds that

---

[3] The Supreme Court, in recently issuing *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), reverted to an earlier framework under which to assess agency interpretations. Both prior to and during oral arguments in this matter, Petitioners repeatedly invoked *Loper Bright* in support of their position. *See, e.g.*, [ECF No. 72]. However, *Loper Bright* is of little consequence in this matter. For one, this Court reaches its conclusion without deferring to BLM's interpretation of the WHA, NEPA, or FLPMA—only that its actions were justified by those laws. For another, the Supreme Court in *Loper Bright* noted that while an agency's interpretation of a statute cannot bind a court, it may still be especially informative to the extent it rests on factual premises within that agency's expertise. 144 S. Ct. at 1167 (internal citation omitted). That informativeness would become ever more salient given the unique nature of this regime and management of the Checkerboard. Lastly, insofar as the cases cited throughout this ruling themselves rely upon the old framework overturned by *Loper Bright*, the Supreme Court made clear that it did not find justification to overrule those cases as well. *Id.* at 2273.

14

each contention fails for either conflating the RMP Amendment with a removal decision, misconstruing BLM's obligations, or contradicted by the record.

Viewing BLM's actions as consistent with their obligations under the WHA, the Court finally turns to whether BLM complied with their separate obligations under FLPMA and NEPA. In so doing, it is determined that BLM both complied with, and were justified in complying with, their obligations under FLPMA and NEPA. Accordingly, the Court concludes that Petitioners fail to advance an actionable violation of the APA and BLM's actions are affirmed.

### A.     *Petitioners Largely Maintain Justiciable Claims.*

Federal courts are of limited jurisdiction; only authorized to adjudicate "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1; *Already v. Nike*, 568 U.S. 85, 90 (2013). Subject matter jurisdiction must exist "not only at the time the complaint is filed, but through all stages of litigation." *Id.* at 91 (cleaned up and citation omitted); *see also* Fed. R. Civ. P. 12(h)(3). A plaintiff seeking review of agency action under the APA bears the burden of satisfying jurisdictional requirements. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–93 (1990). Jurisdictional requirements are often evaluated through the doctrines of standing and ripeness, which may "substantially overlap in many cases" as both involve the question of "whether the harm asserted had matured sufficiently to warrant judicial intervention." *Southern Utah Wilderness All.* (*SUWA*) *v. Palma*, 707 F.3d 1143, 1157 (10th Cir. 2013) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)). The analyses for each are analytically distinct, with standing focusing on "the qualitative

sufficiency of the injury," and ripeness considering "whether this is the correct *time* for the complainant to bring the action." *Id.* (emphasis original; quotation omitted).

Federal Respondents argue that Petitioners fail to meet their burden of satisfying jurisdictional requirements because their claims are not ripe for adjudication, and they do not establish an "injury in fact" for standing purposes. [ECF No. 54, at 31–35]. Each Petitioner retorts that their claims are ripe and that they maintain standing, given the effect of issuing the RMP Amendment and the impending nature of wild horse removal. [ECF No. 61, at 8–17]; [ECF No. 62, at 14–20]; [ECF No. 67, at 9–19]. In addressing these justiciability contentions, the Court begins with analyzing whether Petitioners' claims are ripe for adjudication. From there, the Court views in aggregate whether Petitioners allege sufficient injury in fact required for standing.[4]

1.   Ripeness.

When deciding whether an agency's decision is ripe for judicial review, a court considers:

> (1) whether the issues in the case are purely legal; (2) whether the agency action involved is 'final agency action' within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704; (3) whether the action has or will have a direct and immediate impact upon the plaintiff and (4) whether the resolution of the issues will promote effective enforcement and administration by the agency.

*SUWA*, 707 F.3d at 1158 (quoting *Coalition for Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1250 (10th Cir. 2001)). Ripeness turns on "the fitness of the issues for

---

[4] Petitioners filed a notice regarding BLM's recent Notice of Scoping. [ECF No. 63]. The Court asked for supplemental briefing on the issue and its effect upon the instant matter. [ECF No. 64]. The parties filed additional briefing. [ECF Nos. 68–71]. As the Notice of Scoping is not a final agency action, it renders no effect upon the Court's conclusions.

judicial decision and the hardship to the parties of withholding court consideration." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)); *see also Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 810–12 (2003). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citation omitted). "The doctrine of ripeness prevents courts from entangling themselves in abstract disagreements over administrative policies, while also protecting the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *SUWA*, 707 F.3d at 1158 (cleaned up and citation omitted). "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 809 (citation omitted).

Federal Respondents argue that Petitioners' claims are not ripe for adjudication, as they seek judicial review of agency actions not yet undertaken. [ECF No. 32–34]. In the former's view, as "[t]he RMP Amendment challenged here does not authorize the gather or removal of any horses, nor does it represent the final step in the agency's decision-making process to remove horses," these actions alone do not ripen Petitioners' claims. *Id.* at 32 (citing 43 C.F.R. § 1601.0-2). Recognizing that the RMP Amendment "is an important and necessary step towards gathers of wild horses on the Checkerboard," Federal Respondents nonetheless argue that it is "not the final decision to gather horses" and that until such gathers are officially authorized, any challenges to such actions have not ripened.

17

*Id.* at 32–33 (citing *Ohio Forestry Ass'n*, 523 U.S. at 729–30). In support, Federal Respondents cite to myriad court decisions regarding both land-use plan amendment in general as well as amendments to RMPs governing wild horses in particular. *Id.* at 33 (internal citations omitted).

By contrast, Petitioners reiterate the ripeness of their claims by arguing that it makes wild horse removal either substantially more likely or even inevitable. *See, e.g.*, [ECF No. 62, at 16–20]. Beyond this, they reiterate the impact that resolving such purely legal issues would have upon their interests, including environmental and regulatory. *See, e.g.*, [ECF No. 61, at 11–15]. It is worth noting that Petitioners do not distinguish between their claims which conflate RMP Amendment with removal, those regarding the WHA that do not, and those which are procedural-based claims regarding NEPA and FLPMA.

The Court strikes a balance between the parties. Federal Respondents are correct that claims asserting that BLM has removed wild horses are not ripe. The RMP Amendment is but a step toward possibly conducting future gathers to remove wild horses. Wild horse gathers are likely to be in accordance with the provisions advanced in the RMP Amendment and the Decision itself, but the history of the Checkerboard demonstrates that conducting gathers, let alone planning them, has rarely been a straightforward process. *See Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 943 (10th Cir. 2016) (noting that even removal decisions involve several steps, as "determination that an overpopulation exists in a given HMA is not sufficient, standing alone to trigger any duty on the part of the BLM," who "must also determine that action is necessary to remove excess animals"). Past litigants (even current litigants) have repeatedly argued that BLM has historically failed to

18

conduct gathers in a prompt manner. *See, e.g.*, *American Wild Horse Pres. Campaign*, 847 F.3d at 1180–81. This unpredictable pattern of BLM gather plans, coupled with the fact that future gathers would require further planning and findings, lends more toward considering such gathers "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. at 300 (quotation). For all the Court is aware, BLM may stray (improperly or not) from the RMP Amendment when conducting gathers, but the likelihood of such gathers alone does not warrant abrogating any "protect[ion] [of] agencies from judicial interference until an administrative decision [on the gathers] has been formalized and its effects felt in a concrete way by the challenging parties." *SUWA*, 707 F.3d at 1158.

Federal Respondents are apt to note the decisions of other courts. *See* [ECF No. 54, at 32–34] (internal citations omitted). Regarding land-use plan amendments in general, there is reticence in considering challenges to such amendments as ripe in absence of the action itself being authorized. As the Supreme Court held in *Ohio Forestry Association* on the issue of logging, a land-use plan amendment that made "logging more likely in that it is a logging precondition," yet "in its absence logging could not take place," did not mean that such plan amendment was ripe for review unless and until logging was actually authorized. 523 U.S. at 729–30.

Such reticence extends to the narrow issue of amendments to RMPs governing wild horses, albeit at a lower level of the federal judiciary. In the case of amendments to RMPs governing wild horses, multiple courts have similarly held that such amendments are not ripe for review until they are implemented. *See generally Western Watersheds Project v.*

19

*Haaland*, 850 F. App'x 14 (D.C. Cir. 2021); *Friends of Animals v. BLM*, 514 F. Supp. 3d 290 (D.D.C. 2021); *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39 (D.D.C. 2021). In *Western Watersheds Project*, the D.C. Circuit explained that while an RMP amendment was a final agency action for purposes of judicial review under the APA, any challenge to that amendment was not ripe until BLM "began to implement its resource management plan by taking the formal steps required for a roundup" and, therefore, the "statute-of-limitations clock started with the first roundup." 850 F. App'x at 15 (relying on *Ohio Forestry Ass'n*, 523 U.S. at 732–37). The D.C. District Court, in two separate cases (and akin to this action), withheld review of gather plans under certain conditions in which the plans "contemplate future, discrete agency actions—administering contraceptives to horses or removing them through future gathers—over the course of ten years. But when and under what circumstances those actions will occur remains to be determined." *Friends of Animals v. BLM*, 514 F. Supp. 3d at 302 (quotation); *see also Friends of Animals v. Pendley*, 523 F. Supp. 3d at 61 (quoting *id.*). Accordingly, until BLM issues a decision authorizing a gather, Petitioners lack claims which are ripe for adjudication on the removal of wild horses.

Inversely, however, this lack of ripeness does not extend to the issue of whether BLM committed procedural violations in issuing the RMP Amendment. On the questions of whether BLM's process and ultimate decision violates the WHA, FLPMA, or NEPA, Petitioners' claims are ripe for adjudication. A decision is not ripe for review where "there has not been a consummation of the agency's decisionmaking process sufficient to support litigation of the issue [a plaintiff] seeks to raise." *SUWA*, 707 F.3d at 1159. Yet, claims that

an agency violated required procedures, including NEPA, are ripe when issued and "can never get riper." *Ohio Forestry Ass'n*, 523 U.S. at 737; *see also Sierra Club*, 287 F.3d at 1264.

Upon issuance, the RMP Amendment opened the potential for procedural-based challenges. Courts have found that challenges to wild horse land-use plan decisions, such as the RMP Amendment, are ripe as soon as they are issued. *American Wild Horse Pres. Campaign v. Zinke*, 2017 WL 4349012, at *2 (D. Idaho Sept. 29, 2017). Given the implications to the pertinent acts, those procedural-based claims regarding FLPMA and NEPA, as well as those regarding the WHA which do not conflate RMP Amendment with removal, are "purely legal" issues. *SUWA*, 707 F.3d at 1158. Insofar as the RMP Amendment changes the legal classification of certain lands and the corresponding management levels, it is a "final agency action" within the meaning of the APA. 5 U.S.C. §§ 704, 706. There is no "further factual development" which would alter any inquiry into whether BLM violated the WHA, FLPMA, or NEPA in issuing the RMP Amendment. *Sierra Club*, 287 F.3d at 1262. As resolution would affect the environmental and regulatory interests, the action would invariably "have a direct and immediate impact upon" Petitioners. *SUWA*, 707 F.3d at 1158. Lastly, resolution of these issues, in either direction, would "promote effective enforcement and administration by" BLM by clarifying a key dispute. *Id.*

Again, the same rationale does not extend to assuming that the RMP Amendment is self-executing in removal of wild horses. But to this end, the Court concludes that Petitioners largely maintain claims under the APA that are ripe for adjudication, but only

21

insofar as they allege procedural violations of the WHA, FLPMA, and NEPA. As such, the Court turns to whether Petitioners maintain standing to bring these claims.

2.    Petitioners Maintain Standing.

To satisfy the "injury in fact" element of standing, one of the three requirements for Article III standing, a petitioner must identify "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted); *see also Citizens for Const. Integrity v. United States*, 57 F.4th 750, 759 (10th Cir. 2023), *cert. denied*, 144 S. Ct. 94 (2023). "[A] main focus of the standing inquiry is whether plaintiff has suffered a present or imminent injury, as opposed to a mere possibility, or even probability, of future injury." *Morgan v. McCotter*, 365 F.3d 882, 888 (10th Cir. 2004) (citing *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 942–93 (10th Cir. 2003)); *see also Schmier v. U.S. Ct. of Appeals for Ninth Cir.*, 279 F.3d 817, 821 (9th Cir. 2002) (internal quotation marks and citation omitted) ("[T]hat injury must have actually occurred or must occur imminently; hypothetical, speculative or other possible future injuries do not count in the standings calculus.").

Federal Respondents argue that Petitioners fail to demonstrate an injury in fact by the issuance of the RMP Amendment. [ECF No. 54, at 34–35]. Reviewing Petitioners' accompanying declarations to support their standing to bring this case, Federal Respondents argue that such declarations "make clear that all the alleged injuries plainly stem from harms that would be incurred by a future gather" and highlight that "there is no actual or imminent harm from the approval of the planning-level RMP Amendment." *Id.*

22

As such, they argue, Petitioners cannot satisfy Article III standing requirements "absent such actual or imminent harm." *Id.* at 35.

Like their arguments on ripeness, Petitioners largely argue that the RMP Amendment increases the likelihood of an injury in fact which is actual or imminent. *See, e.g.*, [ECF No. 61, at 8–12]. Most crucially, however, they provide further caselaw in support of their position. *Id.* (internal citations omitted).

As with the issue of ripeness, the Court strikes a balance between the parties. The Court agrees with Federal Respondents that Petitioners fail to establish an actual or imminent harm of wild horse removal for injury-in-fact purposes. Each of Petitioners' provided declarations either articulate that harm would result from future gathers, or any such present harm stems from the potential of future gathers. *See* [ECF No. 49-1, 49-2, 49-3, 49-4, 50-1, 51-1, 51-2]. There are two examples of the former. First is the declaration of Suzanne Roy, which makes clear that any injuries to AHWC arise from *actual* implementation or gathers. [ECF No. 50-2] (emphasis added) ("AWHC maintains that, *if implemented*, the BLM decisions challenged in this case . . . will substantially impair its interests . . . ."). The second comes from the declaration of Carol Walker, listing the harms she *will* allegedly experience due to "roundups." *See* [ECF No. 50-1]. To be fair, both declarations highlight the individuals' fears stemming from further BLM action. Yet, each example demonstrates that the existence of any harm is contingent upon BLM fully conducting a gather—an action which has yet to be undertaken, let alone authorized.

There is one example of the latter articulation of harm—a present harm stemming from the potential for future gathers. It comes from a Friends of Animals declarant, stating

23

that he suffers "great distress and sadness" because horses "*could* be rounded up and removed permanently from the wild under BLM's RMP Amendment." [ECF No. 50-1] (emphasis added). As with the previous examples, such emotions are not unreasonable. But, again, such present harm derives from *fear* of future gathers, rather than distress and sadness following an action being authorized or undertaken.

However, as with the issue of ripeness, Petitioners maintain standing for the balance of their claims alleging procedural violations of the WHA, FLPMA, and NEPA. FOA aptly notes that plaintiffs do not need to wait for harm to occur before seeking redress. [ECF No. 61, at 8] (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "[F]uture injury may suffice if the threatened injury is certainly impending or there is a *substantial risk* that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (emphasis added). In the case of NEPA, procedural harms "need not be immediate" and plaintiff need only show the violations "created an increased risk of actual, threatened, or imminent environmental harm." *Sierra Club*, 287 F.3d at 1265.

Although the Court will not go as far as FOA, who argues that "BLM's Decision is a final agency action requiring the removal of wild horses," the increased risk of such gathers and the actual legal effects which the RMP Amendment fosters is sufficient for standing. [ECF No. 61, at 9] (quotation). While contingent upon a separate removal decision being issued in the future, such future injury suffices as the RMP Amendment creates "a substantial risk that the harm [of gathers] will occur." *Susan B. Anthony List*, 573 U.S. at 158. As it relates to Petitioners' claims of procedural harms, the inference is the same. BLM's alleged violations of the WHA, FLPMA, and NEPA, Petitioners at least

24

establish that such violations "created an increased risk of . . . threatened . . . environmental harm" to the wild horses through the increased potential for wild horse gathers. *Sierra Club*, 287 F.3d at 1265. Accordingly, the Court recognizes Petitioners' standing to challenge BLM's actions in issuing the RMP Amendment insofar as they allege procedural violations of the WHA, FLPMA, and NEPA.

**B.      *Whether BLM Violated WHA.***

Before delving into the specifics of Petitioners' arguments, the Court begins by resolving certain issues. Petitioners' approach to alleging that BLM violated the WHA is not uniform, but rather advances a litany of alleged violations. However, nearly all of Petitioners' arguments suffer from a ubiquitous defect. Many of Petitioners' arguments rest upon the erroneous assumption that the RMP Amendment itself demands removal of the wild horses.

The RMP Amendment is not self-executing; removal would require a separate decision-making process. *See* 43 C.F.R. § 1601.0-2. Thus, especially considering the preceding analysis, the Court's foray into the WHA itself is necessarily limited to whether BLM has made a procedural error in issuing the RMP Amendment.[5] Under the "highly deferential" standard of review, it becomes readily apparent that Petitioners fail to demonstrate that BLM "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

---

[5] Those arguments conflating RMP Amendment with a self-executing removal decision could also be dispelled through standing. However, seeking to fully address Petitioners' claims, the Court examines them in detail, nonetheless.

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Citizens' Comm'n to Save Our Canyons*, 513 F.3d at 1176 (first quotation); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (second quotation).

RSGA's revocation of consent began the instant conundrum. Section 4 of the WHA created an obligation wherein BLM must remove wild horses from the private lands of RSGA, the non-consenting landowner. 16 U.S.C. § 1334. Petitioners here argue that pursuant to Section 3 of the WHA, BLM must make a TNEB finding prior to deciding upon converting HMAs to HAs. *See, e.g.*, [ECF No. 50, at 41–43]. Keeping in mind the unique nature of ownership within the Checkerboard, Sections 3 and 4 seemingly create dueling and competing obligations upon BLM—the aforementioned statutory Scylla and Charybdis.

This view of the WHA, however, denies BLM the crucial discretion it has in managing land use across multiple mandates. As Federal Respondents note, by recognizing the rights of private landowners under the WHA, Congress appears to have provided BLM with broad guidance and left the details of such a regime to the agency. *See In Def. of Animals v. U.S. Dep't of Interior*, 737 F. Supp. 2d 1125, 1133 (E.D. Cal. 2010) ("[A]n agency like BLM has considerable discretion on how to carry out the directives of the [WHA]."). One such example being BLM's authority to establish "ranges" under 16 U.S.C. § 1331(c), which recognized "the multiple-use management concept for the public lands." *Id.* More striking, as the Eastern District of California articulated, "[t]he [WHA] should consequently not be viewed as requiring that the BLM increase the numbers of horses, *or give wild horses priority over other users*." *Id.* at 1135 (emphasis added).

26

Petitioners seek to kick open the door to invite an issue of statutory interpretation. While not a mistake, doing so was not in their interests. Petitioners' emphasis on Section 3 (albeit misplaced or misconstrued) effectively prioritizes the interests of wild horses over any other use of *public* land and the rights of landowners in *private* land. While they argue that compliance with Section 4 violates Section 3, compliance with *their* view of Section 3 ironically violates Section 4.[6] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation.")

Accompanied by this backdrop, the Court wades into the various alleged WHA violations brought by Petitioners. First is the issue of whether BLM acted arbitrarily and capriciously or otherwise not in accordance with law in adjusting the relevant AMLs. Next are Petitioners' claims that BLM improperly relied upon RSGA's demands and the expired 2013 Consent Decree in reaching its decision. From there, the Court addresses the contentions that BLM was required to make an "excess" determination or to select the minimally feasible management decision. After this point, various miscellaneous arguments alleging WHA violations are briefly addressed.

---

[6] Each Petitioner quotes 16 U.S.C. § 1331 to argue that BLM's RMP Amendment violates their duty to protect wild horses. While § 1331 does state, in part, that wild horses "shall be protected from capture, branding, harassment, [and] death," Yet, each Petitioner fails to articulate how changing HMA boundaries, converting HMAs to HAs, or lowering AMLs is a decision that means BLM is capturing, branding, harassing, or killing wild horses. Such *legerdemain* is emblematic of the main issue infecting Petitioners' arguments—that the RMP Amendment is the same as a removal decision.

1.    AML Adjustments Were Not Arbitrary and Capricious nor in Violation of
      WHA.

Each Petitioner, in various forms, argues that BLM's AML adjustments were arbitrary and capricious or otherwise not in accordance with law or the WHA, as per 5 U.S.C. § 706(2)(A). RTF argues that BLM acted arbitrarily and capriciously, as the latter allegedly did not follow a legal or scientific process for changing the AMLs. [ECF No. 49, at 32–34]. Referring to BLM's Handbook, RTF continues that a lack of site-specific in-depth analysis demonstrates that BLM acted without following their own process and meeting their own criteria. *Id.* at 33–34. Separately, FOA argues that BLM's AML adjustments were arbitrary and capricious, as BLM allegedly based its actions entirely upon factors not intended by Congress and set an AML below the TNEB. [ECF No. 50, at 41–43]. Similarly, AWHC argues that BLM acted arbitrarily and capriciously and not in accordance with law in issuing its AMLs by failing to consider TNEB in its decision and basing its decision on administrative convenience—a factor not intended by Congress. [ECF No. 51, at 40–44].

Respondents, to the extent they respond to Petitioners' individual arguments, largely take the stance that they are misplaced. As Federal Respondents argue, the Handbook's AML methodology—and thus the corresponding criteria and prerequisites—are not applicable when converting HMAs to HAs. [ECF No. 54, at 47–48]. This stems from the fact that, while *functionally* setting an AML to zero, converting HMAs to HAs vacates the need for an AML analysis. Although the Adobe Town HMA was not converted to an HA, Federal Respondents nonetheless justify this by stating that BLM used the best available

28

information, given the limited timeframe within which they were to act. *Id.* at 48–49. Yet, in any event, Federal Respondents qualify their position by stating that, while not required, BLM *did* conduct an AML analysis. *Id.* at 69–70.

RTF replies by reiterating "the clear standards expected of the data and science required" for BLM's decision-making—by statute, regulation, or Handbook—contradicts Federal Respondents' position, and that such information was insufficient for the new AMLs. [ECF No. 67, at 33–34]. Both FOA and AWHC largely focus their applicable rebuttals on the issue of AMLs being below the pertinent TNEB. [ECF No. 61, at 21–25]; [ECF No. 62, at 20–26]. To the extent they continue beyond the issue of TNEB, those arguments rely on conflating RMP Amendment with a self-executing removal decision.

Based upon the record, BLM's AML adjustments cannot be considered either arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). While RTF argues that BLM did not follow a legal or scientific process required for changing the AMLs, there is little to suggest that the pertinent process is required in converting HMAs to HAs. [ECF No. 49, at 32–34]. Impugning BLM for not detailing a process and their reason for not undertaking it, when such a process is not required, would be unreasonable. Yet, even then, as Federal Respondents explain, the decision to convert the HMAs to HAs is sufficiently justified. [ECF No. 54, at 43–45]. Reviewing the ROD and the record as a whole, it becomes clear that BLM explained the rationale for its decision, based upon the realities of Checkerboard ownership. *See, e.g.*, A.R. RMPA-001680, RMPA-001202–04. Thus, because the conversion of HMAs to HAs is justified within the record, the functional lowering of the AMLs is justified by extension.

29

Accordingly, the Court cannot conclude that BLM acted arbitrarily and capriciously or otherwise not in accordance with law by converting the HMAs to HAs, or what Petitioners call AML adjustments.

The Adobe Town HMA, however, constitutes a different story. As it was not converted to an HA, the issue of AML adjustments warrants more attention. RTF's position, that BLM's Adobe Town HMA AML adjustment was arbitrary for relying upon insufficient information, is rebutted as Federal Respondents provide adequate justification. [ECF No. 49, at 34]; [ECF No. 54, at 48–49]. BLM's approach, using the best available information given the time constraints, is a reasonable method for making an AML determination for the Adobe Town HMA. While this would be a perfect opening for RTF to dissect, they fail to provide explicit guidance in reply on this issue. Thus, BLM's Adobe Town HMA AML adjustment cannot be considered arbitrary and capricious or otherwise not in accordance with law.

Insofar as Petitioners raise TNEBs and resource allocations as prerequisites for setting AMLs, Federal Respondents are correct that such contentions are red herrings. [ECF No. 54, at 47–48]. First off, as Federal Respondents argue, "in nearly every instance BLM looks to TNEB and resource allocation to determine an appropriate management level." *Id.* at 48. When converting an HMA to an HA, the inevitable result is that the AML is functionally set to zero. As Federal Respondents argue, "[t]he Handbook's AML methodologies are not meant to apply when BLM is converting an HMA to an HA, which is managed for zero horses" and thus effectively lowering the AML. *Id.* The Court finds no reason to diverge from this reasoning and Petitioners fail to rebut this argument. While

30

FOA does argue that this "non-binding handbook is not entitled deference because it does not represent BLM's authoritative position," it would be incompatible with changing how an agency manages a piece of land to also require that agency to still manage that land as if it were not changed. [ECF No. 61, at 24] (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019)). Thus, as the nature of the Checkerboard would invariably involve wild horses traversing between public and private lands, this is a sufficient justification for BLM's decisions and contrary to Petitioners' suggestions regarding TNEBs and resource allocations.

Based on the above reasons, the Court concludes that BLM did not act arbitrarily and capriciously or otherwise not in accordance with law in AML adjustments, either within the Adobe Town HMA or by converting the remaining HMAs to HAs. Having been explicitly justified within the record, there is no reason to separately address AWHC's argument that BLM based its decision on administrative convenience. [ECF No. 51, at 40–44]. Content, the Court turns to RSGA's involvement and the 2013 Consent Decree.

2.   <u>BLM Did Not Violate the WHA in Abiding by RSGA's Demands and Did Not Rely on the Expired 2013 Consent Decree.</u>

Next, RTF argues that BLM violated the WHA by formulating its decision in accordance with RSGA's demands and did so by relying upon the expired 2013 Consent Decree. [ECF No. 49, at 34–39, 45–46]. In so arguing, RTF reiterates its contentions that BLM violated the WHA by failing to account for a TNEB and, in reaching its decision, had impermissibly done so for administrative convenience. *Id.* at 34–37. In this sense, RTF requests that the Court vacate BLM's decision due to relying "on factors which Congress

has not intended it to consider" as well as "entirely fail[ing] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

First, RTF argues that BLM acted arbitrarily and capriciously by not basing their decisions on whether a TNEB existed in the HMAs, but rather on complying with the 2013 Consent Decree and to RSGA's demands. [ECF No. 49, at 34–37]. As the Court previously explained, BLM did not act arbitrarily and capriciously with respect to whether they determined a TNEB existed in the HMAs. Thus, the Court focuses on the latter half of this contention, or whether BLM acted arbitrarily and capriciously by alleging relying on the 2013 Consent Decree and RSGA's demands as basis for its decision.

Insofar as RTF argues that BLM has improper relied upon the expired 2013 Consent Decree, the record reflects that an alternative explanation may have led to this result. BLM's own regulations and their Wild Horses and Burros Management Handbook ("Handbook"), which were provided as justifications, expressly instruct BLM to consider private lands when determining HMA boundaries. *See* 43 C.F.R. § 4710.3-1; *see also* A.R. RMPA-049414–93 (Handbook); A.R. RMPA-049480 (directing BLM to acquire written permission from private landowners before determining adequate habitat for wild horses within an HMA). The Handbook also delineates the exact ownership pattern and disputes as in the instant action. *See* A.R. RMPA-049421. BLM's interpretation of the WHA is ultimately consistent with its administration from the time the latter was passed—a factor given weight. *Wyoming v. U.S. Dep't of Interior*, 493 F. Supp. 3d 1046, 1074 (D. Wyo. 2020).

From first enactment of the WHA, BLM's interpretation provided for the creation of HAs—a conversion from an HMA "set[ting] an effective AML of zero"—to account for impacts to private lands. 43 C.F.R. § 4710.3-1; *American Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 141–42 (D.D.C. 2020) (quotation). "Persuasive weight is due to an agency's contemporaneous construction of applicable law and subsequent consistent interpretation." *Wyoming v. U.S. Dep't of Interior*, 493 F. Supp. 3d at 1074. BLM's interpretation, contemporaneous with the WHA itself and consistent over time, is given that persuasive weight.

Accounting for these premises, it would be erroneous to conclude that BLM acted arbitrarily and capriciously in accounting for the private lands of a nonconsenting owner and in lowering AMLs. Such decisions were, in part, justified by BLM's longstanding interpretation of the WHA, uncontroverted by the courts. Accordingly, insofar as BLM's Decision corresponds with an expired consent decree or lowers the AMLs, this cannot be considered grounds for reversal under the APA.

As for the second argument by RTF, that BLM improperly relied upon the 2013 Consent Decree as justification for amending the RMP, this contention is similarly unavailing. It is based upon arguing that BLM's interpretation of the Tenth Circuit's decision in *American Wild Horse Preservation Campaign (AWHPC) v. Jewell*, 847 F.3d 1174 (10th Cir. 2016), is erroneous. *See* [ECF No. 49, at 45–46]. On one hand, BLM states that "the Tenth Circuit suggested that the only way to effectively manage the checkerboard would be to follow an RMP amendment process that changed the applicable HMAs to HAs or at the very least, eliminated the private lands from the HMAs and calculations of the

AMLs." A.R. RMPA-059062. On the other hand, RTF quotes the Tenth Circuit in saying that "the ultimate solution must come from Congress." [ECF No. 49, at 46] (quoting *AWHPC*, 847 F.3d at 1189 n.8). RTF uses this to argue that "the Tenth Circuit did *not* pre-sanction the action BLM takes here but instead suggested that Congress may need to change the WHA for BLM to do what it wishes to do." *Id.* (emphasis original).

But following this line of argument, regardless of its veracity, ignores the fact that RTF fails to demonstrate how the Tenth Circuit or BLM's supposed interpretation means that the latter improperly relied upon the Consent Decree in issuing the RMP Amendment. Even if one assumes that the RMP Amendment largely mirrors the Consent Decree, RTF lacks any positive implication that it was an animating consideration. In this sense, RTF's focus on BLM's interpretation of the Tenth Circuit is a red herring. It neither sanctions nor impugns BLM's ultimate decision. Accordingly, the Court cannot rely upon this contention to justify a finding that BLM acted arbitrarily and capriciously, or otherwise not in accordance with law.

   3.   <u>BLM Was Not Required to Make an "Excess" Determination or Choose the Minimally Feasible Management Decision</u>.

Petitioners separately argue that BLM violated the WHA by failing to make an "excess" determination or by failing to choose the minimally feasible management decision in selecting Alternative D. [ECF No. 49, at 39–44]; [ECF No. 50, at 33–36]; [ECF No. 51, at 30–34]. However, each of these contentions relies upon Petitioners' conflation between the planning-level RMP Amendment and a decision removing the wild horses. Yet, as Federal Respondents point out, Petitioners fail to "offer any explanation for why BLM was

34

required to make this ["excess"] determination before amending the RMPs, as opposed to when it subsequently authorizes a gather." [ECF No. 54, at 46]. The Court agrees with Federal Respondents. While an "excess" determination is required for a removal decision, Petitioners provide no justification that an "excess" determination is required for the RMP Amendment process, and the cases Petitioners cited in support do not suggest this either. *See Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1120–21 (D. Mont. 2016) (reviewing a gather plan); *Animal Prot. Inst. of Am.*, 109 IBLA 112 (1989) (reviewing "final plans for removal of excess wild horses"); *Colorado Wild Horse and Burro Coal. v. Salazar*, 639 F. Supp. 2d 87, 90, 95–98 (D.D.C. 2009) (challenging gather plan). As such, BLM did not act arbitrarily and capriciously or otherwise not in accordance with law by not making an "excess" determination before issuing the RMP Amendment. 5 U.S.C. § 706(2)(A).

The same may be said of the contention that BLM was required to select the minimally feasible management decision. [ECF No. 49, at 41–44]; 16 U.S.C. § 1333(a) (stating that "[a]ll management activities shall be at the minimal feasible level"). Again, and as Federal Respondents explain, "the RMP Amendment does not itself authorize any management actions." [ECF No. 54, at 49]. As a result, there is no requirement for BLM to explicitly make a "minimal feasible" finding before issuing the RMP Amendment. In reply, RTF posits that "[t]he WHA requires that *all* management actions be at the minimal feasible level of management." [ECF No. 68, at 31] (citing 16 U.S.C. § 1333(a), and 43 C.F.R. §§ 4701.3-1, 4710.4) (emphasis original). However, their argument again relies on conflating the RMP Amendment process with a removal decision, either self-executing or

35

separate. *See id.* ("First, the WHA is clear that BLM's requirement to remove wild horses from *private lands* (when requested) does not authorize, let alone mandate, their entire removal from *public* lands. . . ."). Thus, insofar as Petitioners argue that BLM violated the WHA by failing to make an "excess" determination or to choose the minimally feasible management decision, these contentions are either unfounded or do not rise to the level of arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Faced with these criticisms, Petitioners do not offer sufficient rebuttal in their replies—or at least one that does not continue to conflate planning with removal.

    4.    <u>Miscellaneous Arguments Do Not Withstand Scrutiny</u>.

Petitioners' remaining arguments that BLM violated the WHA are addressed separately in a brief manner. These being Petitioners' continued conflation of the RMP Amendment with a removal decision, as well as RTF's stray argument that BLM violated the WHA by failing to monitor and minimize genetic diversity risks in the White Mountain HMA. [ECF No. 49, at 44–45]; [ECF No. 50, at 31–33]; [ECF No. 51, at 34–40]. Both lack merit but warrant attention, nonetheless. The Court begins by directly addressing Petitioners' conflation between RMP Amendment and a removal decision.

    *i.*    *Petitioners Conflating RMP Amendment with Removal.*

As alluded to above, Petitioners tend to conflate RMP Amendment with a separate removal decision by BLM. Yet, both FOA and AWHC advance a separate argument that explicitly relies upon this conflation. [ECF No. 50, at 31–33]; [ECF No. 51, at 34–40]. FOA argues that BLM's decision to eliminate wild horses from public lands violates its duty to protect wild horses. [ECF No. 50, at 31–33]. AWHC makes a parallel argument in

36

alleging that BLM's decision to eradicate wild horse herds and adjust AMLs violates the plain language of the WHA, rendering the amendments *ultra vires*. [ECF No. 51, at 34–40]. Both FOA and AWHC later reiterate these positions in their replies in arguing that the looming specter of a potential gather implies that the RMP Amendment is functionally the same as a removal decision. [ECF No. 61, at 25–27]; *see* [ECF No. 62, at 16–17].

Separately, FOA goes on to argue that BLM violated the WHA by relying upon a factor not intended by Congress: administrative convenience. [ECF No. 50, at 36–40]. As they argue, BLM's alleged difficulty managing wild horses in the Checkerboard, as well as an alleged desire to create a barrier between the public and private lands, led BLM to authorize itself to remove wild horses—an action which violates the APA. *Id.* at 37–40. Yet, much like their previous argument, the crux of this argument is that the RMP Amendment authorizes the removal of wild horses.

Yet, as Federal Respondents note, the RMP Amendment and a removal decision, such as through a gather, are distinct in both function and effect. *See* [ECF No. 54, at 32–34]. The RMP Amendment is a high-level planning document and is not self-executing. Removal of the wild horses, although more likely due to the RMP Amendment, occurs after a separate administrative process. *See* A.R. RMPA-001213 (explaining removal actions and gather plans). While Petitioners argue that this is an erroneous distinction, the Court takes stock in the fact that a separate administrative process, accompanied by a period for public comment, allows for airing of grievances separate from the RMP Amendment. Separately, while FOA continues to argue that BLM improperly relied upon administrative convenience in creating barriers and authorizing removal of wild horses,

37

they do so by explicitly arguing that BLM's actions are a thinly veiled removal decision. [ECF No. 50, at 36–40]. The same analysis applies to this argument. Accordingly, insofar as FOA and AWHC argue that BLM violated the WHA for removing wild horses through the RMP Amendment, and as FOA argues that BLM improperly relied on administrative convenience in authorizing removal through the RMP Amendment, these contentions are unwarranted.

      *ii.*        *Genetic Diversity Risks in the White Mountain HMA.*

Idiosyncratic among the Petitioners, RTF separately argues that BLM acted arbitrarily and capriciously by not adequately monitoring and minimizing genetic diversity risks in the White Mountain HMA. [ECF No. 49, at 44–45]. This is because BLM is allegedly "relying on old data about genetic herd health" and because "the data for the White Mountain herd indicate that BLM needs to monitor and management the fragile genetic nature of the herd." *Id.* at 44 (citing A.R. RMPA-001336–37). Without this data, they argue, BLM "does not have the data to conduct a proper analysis under WHA, FLPMA, or NEPA, and is acting arbitrarily and capriciously in this regard without adequately analyzing genetic risks." *Id.* at 44–45.

Federal Respondents wrap their response up with a litany of RTF's miscellaneous arguments. [ECF No. 54, at 50]. They argue that this contention is baseless as "BLM did not change the AML for the White Mountain HMA, which would continue to be managed for an AML of 205-300 wild horses." *Id.* Moreover, they posit that RTF fails to explain "what legal requirement BLM has supposedly violated with respect to the White Mountain HMA." *Id.*

38

The Court agrees with Federal Respondents in both respects. There is nothing to suggest that the AML for White Mountain HMA was altered, and RTF fails to provide such evidence *See* A.R. RMPA-001209–10 (comparing "no action" alternative to selected Alternative D). As the AML was not changed, there is no reason to conclude that BLM erroneously relied on old data. Separately, without an explicit legal requirement from RTF that BLM supposedly violated, the Court cannot find basis to conclude that BLM acted either arbitrarily and capriciously or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Faced with these obstacles, RTF fails to sufficiently rebut them and maintain their argument.

## C.     *Whether BLM Complied with FLPMA.*

Petitioners fail to demonstrate that BLM failed to comply with FLPMA. FLPMA, like NEPA, imposes additional procedural obligations and constraints upon agencies, and particularly in formulating and issuing land-use management plans. *See* 43 U.S.C. §§ 1701 *et seq.*  FLPMA requires agencies such as BLM to manage public lands under the principles of multiple use. 43 U.S.C. § 1372(a). It also requires BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands," otherwise known as "UUD." 43 U.S.C. § 1732(b). Lastly, it requires that BLM "shall prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values" and that "[t]his inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values." 43 U.S.C. § 1711(a).

Regarding all three aforementioned FLPMA provisions, RTF argues that BLM failed to comply with them in issuing the RMP Amendment. [ECF No. 49, at 47–49].

39

Federal Respondents retort by first seeking to narrow Petitioners' FLPMA claims to those included in opening briefs and then addressing RTF's individual arguments. [ECF No. 54, at 50–55].

The Court follows Federal Respondents' line of argumentation, starting with the issue of waiver regarding Petitioners' FLPMA claims. From there, the Court turns to analyzing the three FLPMA provisions with which RTF alleges BLM failed to comply— the multiple use principle, UUD, and current inventories.

1.      Waiver of FLPMA Claims and Narrowing Petitioners' Claims.

Only RTF's claims under the FLPMA are sustained and considered, for AWHC's failure to raise them in their opening brief. "Ordinarily, a party's failure to address an issue in its opening brief results in that issue being deemed waived." *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019).

Both Petitioners AWHC and RTF brought claims under FLPMA in their Petitions for Review. Yet only RTF included a FLPMA claim in their Opening Brief. Federal Respondents note this in their Response Brief, asking the Court to deem AWHC's FLPMA claim waived. [ECF No. 54, at 50–51].

The Court agrees with Federal Respondents. As AWHC fails to address their FLPMA claim in their Opening Brief, it will be considered waived. *Walker*, 918 F.3d at 1151. Accordingly, in addressing BLM's alleged FLPMA violations, the Court will only rely on RTF's arguments in both its Opening Brief and Reply.

40

2.    RMP Amendment and FLPMA.

As the Court noted in introducing FLPMA, RTF argues that BLM failed to comply with three provisions of FLPMA: (1) the multiple use principle, 43 U.S.C. § 1732(a); (2) UUD, 43 U.S.C. § 1732(b); and (3) the current inventories requirement, 43 U.S.C. § 1711(a). [ECF No. 49, at 47–49]. As they argue, BLM's decision violates the FLPMA— and by extension, the APA—for failing to comply with these explicit requirements. First, that BLM is acting contrary to the principle of "multiple use" if wild horses are removed to satisfy the demands of private landowners. *Id.* at 47. Second, that BLM failed to assess whether its preferred action (Alternative D) will cause "unnecessary or undue degradation" (UUD) of public lands. *Id.* at 48 (citing 43 U.S.C. § 1732(b)). And third, that BLM does not have the required current inventories to amend these RMPs. *Id.* at 49.

Federal Respondents provide the most useful rebuke of RTF's arguments and do so by addressing each individually. [ECF No. 54, at 51–55]. For multiple use, they argue that there is no legal requirement that BLM prioritize certain uses and nonetheless did such an analysis. *Id.* at 51–53. Regarding UUD, they argue that BLM did such an analysis and that there was no indication that their actions would lead to environmental degradation. *Id.* at 53. As they contend regarding current inventories, they qualify the language of 43 U.S.C. § 1711(a) and note that such information is not necessary for RMP Amendment, as it is merely a planning-level determination. *Id.* at 54–55.

While the State of Wyoming and RSGA also provide arguments in response, Federal Respondents' rebuke was far more useful in dispensing with RTF's arguments. [ECF No. 55, at 36–43]; [ECF No. 56, at 38–40]. However, RTF's reply brief largely focuses on

41

addressing the arguments of RSGA and the State of Wyoming while reiterating the initial positions, rather than those of Federal Respondents. [ECF No. 67, at 23–25]. Nonetheless, the Court addresses each FLPMA provision separately, starting with the multiple use principle.

> i.      *Multiple Use Principle.*

FLPMA requires that agencies such as BLM manage public lands by the principle of "multiple use." 43 U.S.C. § 1732(a). "Multiple use" management of the public lands and their various resources should "best meet the present and future needs of the American people; . . . including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources." 43 U.S.C. § 1702(c). Multiple use management, a fundamental purpose of FLPMA, requires land management "that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values. . . ." 43 U.S.C. § 1701(a)(8).

RTF argues in its Opening Brief that BLM violated FLPMA "because it has sacrificed 'multiple use' for private demands." [ECF No. 49, at 47] (citing 43 U.S.C. § 1732(a)). In RTF's view, since BLM amended the RMP to remove wild horses from large portions of public lands because of conflicts with private landowners, the agency acted contrary to the explicit purposes of FLPMA. *Id.*

Federal Respondents provide a forceful rebuttal. In short, they argue that the multiple use principle "does not require BLM to prioritize one type of use, such as wild horse management, over another." [ECF No. 54, at 51–52] (citing *N.M. ex rel. Richardson*

42

*v. BLM*, 565 F.3d 683, 710 (10th Cir. 2009)). Notwithstanding this argument, Federal Respondents argue that RTF provides no caselaw in support of the contrary, as well as returning to the record to argue that BLM had adequately explained its decision. *Id.* at 53.

In reply, RTF does not address the multiple use arguments of Federal Respondents. Rather, in seeking to reaffirm its position, RTF merely focuses on rebutting the arguments of Wyoming and RSGA, which are focused elsewhere. [ECF No. 67, at 23–25].

The Court agrees with Federal Respondents. As they note, there is simply nothing in FLPMA which prioritizes one use over another. *N.M. ex rel. Richardson*, 565 F.3d at 710. Although RTF argues that the RMP Amendment simply confers benefit to RSGA at the expense of the public, they provide no caselaw to support that this is contrary to the principle of multiple use. [ECF No. 49, at 47]. Even then, the record clearly demonstrates that BLM adequately explained the basis for its decision in accordance with the principle of multiple use. *See* A.R. RMPA-001677, RMPA-001245–84, RMPA-001680. Faced with these arguments, as raised by Federal Respondents, RTF elected to attack those dissimilar arguments of RSGA and Wyoming and ignoring the force of Federal Respondents' arguments. Accordingly, the Court finds no basis to conclude that BLM violated FLPMA by ignoring the principle of multiple use.

### ii. *Unnecessary and Undue Degradation.*

FLPMA separately requires an agency to "take any action necessary to prevent unnecessary or undue degradation ["UUD"] of the lands." 43 U.S.C. § 1732(b).

RTF argues that BLM failed to analyze whether Alternative D causes any UUD, or "whether any other Alternative would cause *less* degradation of public lands, which [BLM]

43

is required to do." [ECF No. 49, at 48] (emphasis original) (citing *Sierra Club v. Lujan*, 949 F.2d 362, 369 (10th Cir. 1991)). In RTF's view, BLM "is ignoring its statutory duty" for the sake of RSGA and administrative convenience, and because BLM "did not consider UUD as a factor" for any proposed Alternatives, they have violated FLPMA. *Id.* (citing 43 U.S.C. § 1732(b), and *Soda Mountain Wilderness Council v. Norton*, 424 F. Supp. 2d 1241, 1269 (E.D. Cal. 2006)).

Federal Respondents retort by first arguing that "RTF points to no evidence that the RMP Amendment will actually lead to [UUD] of rangeland" while arguing that BLM had violated FLPMA simply "because the words 'unnecessary or undue degradation' were not used in the ROD or Final EIS." [ECF No. 54, at 53]. Pointing to the record, Respondents argue BLM *did* consider UUD and included this analysis in both the ROD and Final EIS. *Id.* (citing A.R. RMPA-001207, RMPA-001245–84, RMPA-001677–80). Moreover, they assert, BLM ultimately selected Alternative D "with that [UUD] consideration in mind." *Id.*

In reply, RTF mainly targets the arguments of Wyoming and RSGA while reiterating their position that BLM violated and largely ignored FLPMA, or at least that BLM's analysis was deficient. [ECF No. 67, at 24–25]. Again, characterizing the RMP Amendment as "a concession to satisfy RSGA," RTF argues that none of the Respondents "can show where or how BLM analyzed whether changing these public lands from HMAs to HAs would cause any [UUD] of the lands." *Id.* at 23–24.

The Court agrees with the Respondents. Contrary to RTF's assertions, the record implies that BLM did consider and explain UUD, ultimately leading towards its selection

of Alternative D. While FLPMA requires that BLM consider UUD, there is nothing to suggest that it also requires BLM to explicitly delineate every aspect of UUD—let alone use the words "unnecessary and undue degradation." As Federal Respondents aptly note, the record shows that BLM "performed the analysis RTF claims is absent" by analyzing all alternatives "to consider the impacts that [each] would have on the quality of the rangeland" and, when analyzing said impacts, BLM "explicitly considered the impacts to wild horses and math other resources . . . ." [ECF No. 54, at 53] (internal citations omitted). RTF does not rebut this contention (or even address Federal Respondents). Rather, they focus on the arguments of Wyoming and RSGA. Accordingly, the Court finds that BLM conducted the required UUD analysis and did not violate FLPMA in this respect.

### iii. Current Inventories.

Lastly, FLPMA requires that public land inventories be prepared and maintained, as well as must "be kept current so as to reflect changes in conditions and to identify new and emerging resources and other values." 43 U.S.C. § 1711(a). However, "[t]he preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands." *Id.*

RTF argues that both the FEIS and ROD shows that BLM decided to amend the RMPs "without having current data (regarding population levels, forage, water, other wildlife resources, etc.) to inform its change in management." [ECF No. 49, at 49]. Thus, they argue, since FLPMA requires these inventories, "BLM should not be permitted to amend its RMPs . . . where it is removing a main natural resource and land use on a vast scale." *Id.*

Federal Respondents raise two rebuttals. First, they cite back to the same statute as RTF, but includes the one sentence the latter omitted, to argue that BLM is not barred from amending RMPs despite failing to maintain current inventories. [ECF No. 54, at 54]. Second, while reiterating their position that the RMP Amendment "is a planning-level determination," additional environment data is "not a necessary consideration at this stage and, if required, will occur before any implementation of the RMP Amendment." *Id.* at 54–55.

RTF does not directly respond to these rebuttals. At best, they reiterate their position that "BLM must base its assessment on current land conditions and resource usages." [ECF No. 67, at 24–25] (citing *Utah v. Andrus*, 486 F. Supp. 995, 1005 n.13 (D. Utah 1979)).

The Court agrees with Respondents. While § 1711(a) requires that public land inventories must be prepared and maintained, as well as must "be kept current," Federal Respondents aptly note the sentence immediately following this provision, stating that "preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands." 43 U.S.C. § 1711(a). RTF does not rebut this argument, but rather just impliedly reiterates its original position.

Accordingly, the Court cannot find that BLM violated FLPMA for failure to maintain current inventories. As a result, RTF fails to establish that BLM did not comply with either of the three pertinent FLPMA provisions in amending the RMP. The Court next turns to the issue of whether BLM complied with NEPA.

46

### D.     Whether the RMP Amendment Complied with NEPA.

As with FLPMA, NEPA provides for several additional procedural requirements and obstacles for agencies involved in land-use plan management decisions. *See* 42 U.S.C. §§ 4331 *et seq*. First, NEPA requires agencies to consider alternatives to any project that might have a significant effect on the quality of a human environment. 42 U.S.C. § 4332(C)(iii). However, this secondarily requires that the agency set forth a properly defined statement of purpose and need. 40 C.F.R. § 1502.13 (2012). For both consideration of reasonable alternatives and drafting a statement of purpose and need, the agency is given broad discretion. *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1243–44 (10th Cir. 2011).

Second, NEPA requires that agencies to take a "hard look" at the environmental impacts of their decisions before the decision is made, to assure that a decision is the product of reasoned decision-making. 42 U.S.C. § 4332(2)(C). In so doing, the ultimate decision cannot be one that was "predetermined" to be selected. *Wyoming*, 661 F.3d at 1264. Nonetheless, the "hard look" required by an agency may be idiosyncratic and contingent upon the underling circumstances.

These provisions and their sub-requirements form the foundation of the underlying NEPA-based claims. Petitioners' claims that BLM failed to comply with NEPA broadly fall into two categories: (1) that BLM failed to consider all reasonable alternatives, in part because of an allegedly unreasonably narrow purpose and need statement; and (2) that BLM failed to take a "hard look" at relevant data and public comments, and therefore the RMP Amendment was not the product of reasoned decision-making.

47

In analyzing the merits of Petitioners' NEPA-based claims, the Court starts with whether BLM considered all reasonable alternatives, as per 42 U.S.C. § 4332(C)(iii). This involves the subsidiary inquiries of whether BLM drafted a properly defined statement of purpose and need, as per 40 C.F.R. § 1502.13, the reasonableness of proposed alternatives, and if BLM adequately addressed those alternatives.

From there, the Court continues in discussing whether BLM took the requisite "hard look" at the impacts of their decision, as per 42 U.S.C. § 4332(2)(C). Similarly, this requires subsidiary inquiries, albeit more fact-specific than rule-specific. First being whether Petitioners adequately allege that BLM selected a predetermined decision. The remaining four subsections address whether BLM considered the necessary data, benefits and impacts, the potential for increased livestock grazing, and public comments.

The Court begins with addressing whether BLM considered all reasonable alternatives.

### 1.    Reasonable Alternatives Considered.

Agencies must consider alternatives to any project that might have a significant effect on the quality of the human environment. 42 U.S.C. § 4332(C)(iii). But agencies need not consider every possible alternative to a proposed action, only "reasonable" alternatives. *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1183 (10th Cir. 2013) (citing 40 C.F.R. § 1502.14(a)). A court judges the reasonableness of the alternatives measured against two guideposts: (1) "the agency's statutory mandate" and (2) the "agency's objectives for a particular project." *N.M. ex rel. Richardson*, 565 F.3d at 709. However, NEPA "does not require agencies to analyze the environmental consequences of

48

alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." *Colorado Env't Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999) (citation omitted).

Broadly speaking, Petitioners argue that BLM failed to consider all reasonable alternatives, in part because the latter had allegedly crafted an unreasonably narrow purpose and need statement which made its chosen alternative a foregone conclusion. [ECF No. 49, at 54–55]; [ECF No. 50, at 48]. Respondents largely rebuke such an assertion. Federal Respondents in particular first argue that the purpose and need statement of the RMP Amendment was not narrowly defined as to preclude reasonable options. [ECF No. 54, at 56–59]. From there, they continue in addressing each alternative—considered or hypothetical—raised by Petitioners to argue that they did not fail to comply with NEPA in reaching their conclusion. *Id.* at 59–67. The Court bifurcates this inquiry in line with Federal Respondents' argument and starts with analyzing whether the RMP Amendment's purpose and need statement was properly defined.

> i.   *Purpose and Need of RMP Amendment Properly Defined.*

A statement of purpose and need must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. An agency has "considerable discretion to define" the purpose and need of its action. *Wyoming*, 661 F.3d at 1244. "A court may not reject BLM's stated objectives unless they are defined so narrowly as to foreclose reasonable options." *Western Watersheds Project v. BLM*, 721 F.3d 1264, 1276 (10th Cir. 2013) (citing *N.M. ex rel. Richardson*, 565 F.3d at 709)). "In determining whether an agency considered

49

reasonable alternatives, courts look closely at the objectives identified in an EIS's purpose and needs statement." *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1030.

Albeit largely intertwined with their predetermination argument, RTF argues that BLM defined the RMP Amendment's objectives in terms so unreasonably narrow that the scope of the project was "primarily serving the wishes of RSGA." [ECF No. 49, at 54–56]. FOA and AWHC do not focus on the purpose and need of the RMP Amendment in their Opening Briefs, but rather upon the range of alleged reasonable alternatives.

Federal Respondents largely fall back upon BLM's "consideration discretion to define" the purpose and need of its actions, as well as the fact-specific nature of a court's inquiry. [ECF No. 54, at 57] (citing *Wyoming*, 661 F.3d at 1244 (quotation), and *Citizens' Comm'n to Save Our Canyons*, 297 F.3d at 1030). Wielding this framework, they plead with the Court to defer to BLM's discretion and recognize the unique nature of the Checkerboard lands and the necessity of abiding by RSGA's demands. In this sense, the purpose and need for RMP Amendment is not unreasonably narrow, but just broad enough to fit the instant issue compromising the regulatory regime.

RTF replies by more explicitly merging their arguments with those that BLM selected a predetermined outcome. Nonetheless, they reiterate their original position but also infer that because the ultimate decision complied with the wishes of RSGA, BLM selected a predetermined outcome, and had done so through an unreasonably narrow statement of purpose and need. [ECF No. 67, at 19–22].

The Court agrees with Federal Respondents that the purpose and need statement for the RMP Amendment was properly defined. While this question is largely intertwined with

50

the separate issue of whether BLM was predetermined in selecting the outcome, that issue is addressed later. As such, the Court focuses on whether BLM's purpose and need statement was unreasonably narrow.

The RMP Amendment was necessitated and driven by RSGA's revocation of consent following the expiration of the 2013 Consent Decree. The fact that the purpose and need statement may reflect this practical reality does not necessarily mean that it was unreasonably narrow. The nature of the Checkerboard, and the existence of wild horses upon it, is heavily contingent upon the consent of private landowners. RSGA's revocation of consent, after the expiration of the 2013 Consent Decree, creates such a fundamental change to the entire regime that it requires focus.

RTF's reply demonstrates the fatal flaw of their argument: it is backwards. In short, RTF argues that because BLM's ultimate decision complied with RSGA's demands, it must have been preordained and therefore could only have been preordained by an unreasonably narrow statement of purpose and need. Such a line of argumentation infers that the ends not only justified the means but also *defined* them. This is logically unsound. It does not serve to imply that BLM abused its "considerable discretion" in defining their purpose and need, as well as drafting their statement accordingly.

Insofar as RTF attempts to analogize to *National Parks & Conservation Association v. BLM*, 606 F.3d 1058 (9th Cir. 2010), Federal Respondents are correct that the facts of that case are readily distinguishable. [ECF No. 49, at 54–56]; [ECF No. 54, at 58–59]. First, unlike here, the main beneficiary in that case was undoubtedly a private entity. *National Parks & Conservation Ass'n*, 606 F.3d at 1071. Second, and relatedly, the purpose and

need statement of that case was explicitly fashioned to meet the *financial* goals of a private entity, rather than competing users and resources on BLM lands, as here. *Id.*

Ultimately, however, BLM has "considerable discretion" in defining the purpose and need of its action. *Wyoming*, 661 F.3d at 1244. An examination of the record demonstrates that the purpose and need statement is not so narrow "as to foreclose reasonable options." *Western Watersheds Project v. BLM*, 721 F.3d 1264, 1276 (10th Cir. 2013) (citing *N.M. ex rel. Richardson*, 565 F.3d at 709)). While Petitioners disagrees with the current regime, BLM is tasked with juggling multiple, often-competing interests. The options advanced in the FEIS are not so blatantly unreasonable as to warrant this Court to abrogate BLM's considerable discretion in defining the purpose and need of the RMP Amendment. *Id.*; *Citizens' Comm'n to Save Our Canyons*, 297 F.3d at 1030. Accordingly, the Court rejects the assertion that BLM's purpose and need statement was narrowly defined. The separate-yet-related issue of predetermination is addressed later.

   *ii.*   *Proposed Alternatives Either Considered or Not Reasonable.*

"[A]n agency is only required to consider 'reasonable alternatives.'" *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1030 (quoting 40 C.F.R. § 1502.14). An agency's decision to examine a particular alternative and its discussion of alternatives need only be "sufficient to permit a reasoned choice among the options." *Wyoming*, 661 F.3d at 1243–44 (internal quotation marks and citation omitted). "Once an agency appropriately defines the objectives of an action, NEPA does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." *Id.* "That is, once an agency establishes the objective of the

52

proposed action—which it has considerable discretion to define—the agency need not provide a detailed study of alternatives that do not accomplish that purpose or objective, as those alternatives are not 'reasonable.'" *Id.* at 1244 (quoting *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1031).

Each of Petitioners include either alternatives that were considered by BLM but unreasonable, or those presented by Petitioners as alternatives not considered but reasonable. RTF mentions an alternative considered by BLM, whereby the latter would engage in land swaps to create a larger, contiguous block of public land. [ECF No. 49, at 54–56]. AWHC, also pointing specifically to the land swap alternative, argues that BLM did not consider any reasonable mid-range alternatives. [ECF No. 51, at 44–49]. By contrast, FOA presents three types of alternatives that they argue BLM should have considered: (1) land swaps to create larger parcels of public land; (2) maintaining wild horses on public lands; and (3) any action that would maintain or increase wild horse AMLs while reducing livestock grazing. [ECF No. 50, at 43–55].

Federal Respondents retort by stating that, for each alternative mentioned by Petitioners, it was either considered by BLM and deemed unreasonable, or is unreasonable in itself. [ECF No. 54, at 59–67]. In their view, a land swap was considered but would neither carry out the purpose and need of the RMP Amendment nor reasonable as it involves millions of acres with no willing participants. *Id.* at 61–65. As for the proposed alternative of managing public lands for wild horses, Federal Respondents state that it was considered but rejected as unfeasible. *Id.* at 65–66. As for a proposed alternative that would reduce livestock grazing, Federal Respondents argue that this is explicitly what was

53

provided in Alternative B and thus cannot constitute a NEPA violation. *Id.* at 66–67. Wyoming largely mirrors the position of Federal Respondents, with the added argument that BLM's considered alternatives were reasonable, contrary to Petitioners' assertions. [ECF No. 55, at 44–50].

In its reply, FOA reiterates their argument that BLM rejected reasonable alternatives and did so by only considering alternatives that served private interests. [ECF No. 61, at 27–32]. Regarding the land swap idea, FOA argues that it was a reasonable alternative as they had multiple years to negotiate one and that it would meet the stated purpose and need. *Id.* at 29–30. Regarding the alternative maintaining wild horses on public but not private lands, FOA argues that BLM failed to consider whether it could do so while also complying with both Sections 3 and 4 of the WHA. *Id.* at 31. As for the alternative maintaining or increasing wild horse AUMs, FOA argues that NEPA requires BLM to consider all reasonable alternatives and not just those explicitly mandated by regulations. *Id.* Separately, AWHC replies by also arguing that BLM rejected the land swap alternative although reasonable and with fewer adverse impacts. [ECF No. 62, at 28–30].

The Court agrees with Respondents. As far as the range of alternatives considered by BLM in issuing the FEIS, those are not unreasonable as to constitute a NEPA violation. Separately, as far as the alternatives proposed by Petitioners, they were considered yet unreasonable. The Court separately examines each alternative below, starting with the land swap.

Contrary to Petitioners' suggestions, the record shows both that BLM considered a land swap and that such an alternative would not be reasonable, hence why it was

eliminated. *See* A.R. RMPA-001205. After being considered, BLM ultimately eliminated the land swap from detailed analysis and adequately explained their reasoning, as is consistent with their NEPA obligations. *Id.* "For those alternatives considered but eliminated from detailed analysis," an agency is "required only to 'briefly discuss the reasons for their having been eliminated'" and "an agency need not independently evaluate alternatives it determines in good faith to be ineffective as a means to achieving the desired ends." *Associates Working for Aurora's Residential Env't v. Colorado Dep't of Transp.*, 153 F.3d 1122, 1130 (10th Cir. 1998) (quoting 40 C.F.R. § 1502.14(a)).

Furthermore, the Court agrees with Federal Respondents that such an alternative seems wholly impractical to BLM's conflicting obligations. A land swap of hundreds of thousands of acres, without a clear and willing participant, would run contrary to BLM's separate obligation to remove wild horses from nonconsenting lands "as soon as practicable." 43 C.F.R. § 4720.2-1. Such an alternative appears impractical and speculative. *Biodiversity Conservation All. v. BLM*, 608 F.3d 709, 714–15 (10th Cir. 2010) (holding that an agency can "eliminate alternatives that are too remote, speculative, impractical, or ineffective"); *see also* A.R. RMPA-000496 (stating that "[a]cquisitions of private lands will only be pursued with willing landowners"). While FOA and AWHC argue that this alternative is reasonable because BLM had several years to negotiate a land swap, that contention is misleading as it would be strange to impugn BLM for both complying with the 2013 Consent Decree while it was still in effect but not negotiating an exchange of the same lands under that Consent Decree. Accordingly, the Court finds no

basis to conclude that BLM violated NEPA for omitting more-detailed analysis of a land swap alternative.

As for the proposed alternative whereby public lands are managed for wild horses, the record similarly demonstrates that BLM considered such an alternative and rejected it as impractical and unresponsive to the needs of the project. A.R. RMPA-001204. The Court disagrees with FOA insofar as such rejection requires detailed analysis. The very nature of the Checkerboard makes continued maintenance of wild horses on public lands—one-square-mile parcels surrounded by private lands—wholly impractical once RSGA's revocation of consent denies management on private land. For that same reason, FOA's argument in reply may be dismissed. The Court agrees that BLM's simple explanation satisfies their obligation. *Associates Working for Aurora's Residential Env't*, 153 F.3d at 1130.

Lastly, as far as FOA argues that BLM did not "seriously consider" an alternative that would maintain or increase wild horse numbers and reduce livestock grazing on public lands, Federal Respondents are apt to point to Alternative B. Alternative B did contemplate maintaining wild horses on the solid-block portions of the HMAs and reducing livestock forage allocation. *See* A.R. RMPA-001199–001200. Albeit not universal, this goes toward the heart of FOA's concern. But to the extent that Petitioners note that the number of livestock AUMs in Alternative B would still be higher than the wild horse AUMs, Federal Respondents are also apt to note that "FOA points to nothing in the statute or regulations that requires BLM to maintain parity between wild horse and livestock AUMs." [ECF No. 50, at 54]; [ECF No. 54, at 67]. Thus, there is nothing in FOA's arguments that establish

BLM completely failed to consider this alternative, regardless of its reasonableness. Accordingly, the Court finds no basis to conclude BLM violated NEPA for failing to consider reasonable alternatives.

2.     BLM Took a "Hard Look" at the Impacts of RMP Amendment.

NEPA requires agencies to take a "hard look" at the environmental impacts of their decisions before the decision is made. 42 U.S.C. § 4332(2)(C); *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1263 (10th Cir. 2011). An agency takes the requisite "hard look" where its NEPA documents "reflect the agency's thoughtful and probing reflection of the possible impacts associated with the proposed project . . . [and] provide a reviewing court with the necessary factual specificity to conduct its review." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781 (10th Cir. 2006) (internal citation omitted). Courts apply "a rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a FEIS are merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002) (internal citation omitted). In determining whether an agency took the requisite hard look, courts consider "whether the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Biodiversity Conservation All. v. U.S. Forest Serv.*, 765 F.3d 1284, 1271 (10th Cir. 2014) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). Otherwise, a "court will not second-guess the wisdom of the ultimate decision." *Citizens for Alts. to*

*Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1098 (10th Cir. 2007) (internal citation omitted).

Each of Petitioner argues, directly or indirectly, that BLM failed to take a "hard look" as required by NEPA, by omitting certain information or analyses. In RTF's view, BLM failed to take a "hard look" at potential environmental effects of their decision. [ECF No. 49, at 49–54]. FOA argues that BLM violated NEPA by failing to take a "hard look" at the positive impacts that wild horses have on the environment, as a result of allegedly reaching a predetermined decision, and by failing to take a "hard look" at the impact of reallocating wild horse forage and the foreseeable increase in livestock grazing. [ECF No. 50, at 56–65]. While AWHC, by contrast, does not explicitly contend that BLM failed to take a "hard look" and instead focuses on the issue of reasonable alternatives, they at least highlight BLM alleged failure to respond to public comments. [ECF No. 51, at 44–49].

Each of Respondents take issue with Petitioners' contentions, albeit for different reasons. Federal Respondents argue that BLM did take the required "hard look" at the consequences of the RMP Amendment, and particularly by considering the necessary data before amendment and the benefits of wild horses as well as the impacts to wild horse viewing. [ECF No. 54, at 67–70]. To the extent that Petitioners argue BLM was required to consider increase livestock grazing, Federal Respondents argue that this is beyond the scope of the RMP Amendment. *Id.* at 70–71. As for the issue of public comments, Federal Respondents argue that BLM did consider and respond to them. *Id.* at 71–72. The State of Wyoming, beyond the issue of whether the Decision was "predetermined," argues BLM did not ignore environmental impacts attributable to wild horses, recognized how wild

horses compete with local fauna, and asks the Court to deter to BLM's technical choices about how to approach evaluation of environmental impacts. [ECF No. 55, at 50–54] (citing *Western Watersheds Project*, 76 F.4th at 1302). Lastly, and beyond the issues regarding potential alternatives, RSGA takes the position that all such "hard look" issues generally lack merit. [ECF No. 56, at 45–47].

FOA replies by reiterating their position that BLM failed to take a "hard look" at the positive impacts of wild horses and the impacts of reallocating them. [ECF No. 61, at 32–34]. In particular, they argue that the only "analysis" of such positive impacts is a passing statement in the FEIS and "BLM's failure to offer any support for [this] conclusory statement or update its overall analysis of the alternatives to consider the positive impacts . . . violated NEPA." *Id.* at 33 (citing *Davis v. Mineta*, 302 F.3d 1104, 1122–23 (10th Cir. 2002)). Separately, calling an increase in livestock grazing as "likely" from lowering wild horse AUMs, FOA argues Federal Respondents are wrong to suggest that considering such a result fall outside the scope of RMP Amendment, and that the latter fails to provide any supporting caselaw. *Id.* at 34. RTF, by contrast, narrowly calls into question Respondents' contentions that BLM's analysis was adequate. [ECF No. 67, at 29–31]. Specifically, they argue that BLM lacked adequate data inputs, sufficient for NEPA, to constitute a "hard look," and thus BLM's effects analyses were flawed. *Id.* As with their Opening Brief, AWHC merely reiterates their "reasonable alternatives" argument, albeit with less parallels to a separate "hard look" argument. [ECF No. 62, at 28–30].

The Court finds insufficient evidence to support the contention that BLM failed to take the requisite "hard look" at any of the information alleged by Petitioners. In reaching

59

this conclusion, the Court analyzes each issue at which Petitioners contend that BLM failed

to take a "hard look," starting with whether the agency selected a "predetermined" decision.

> i.      *Petitioners Fail to Adequately Allege BLM Outcome Predetermined.*

"[I]f an agency predetermines the NEPA analysis by committing itself to an

outcome, the agency likely has failed to take a hard look at the environmental consequences

of its actions due to its bias in favor of that outcome and, therefore, has acted arbitrarily

and capriciously." *Wyoming*, 661 F.3d at 1264 (citation omitted). Courts have a "high"

standard for finding that an agency predetermined its results. *Id.* Specifically, the Tenth

Circuit has stated:

> [P]redetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis—which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action.

*Forest Guardians v. U.S. Fish & Wildlife Serv.*, 661 F.3d 692, 714 (10th Cir. 2010)

(emphasis original).

RTF argues that BLM violated NEPA, in part, for selecting a predetermined

outcome in the amendment process which did not consider reasonable and less-impactful

alternatives. [ECF No. 49, at 54–56]. In RTF's view, BLM "blatantly created a construct

whereby it interprets the expired [2013] Consent Decree and [*AWHPC*, 847 F.3d 1174,] as

mandating a specific management solution, and BLM's whole FEIS is built around

justifying that alternative." *Id.* at 54. Thus, RTF argues, the reason why BLM did not

consider "enough alternatives" beyond Alternative D is because the amendment process's

60

objectives were narrowly defined to primarily comply with the expectations of RSGA. FOA similarly argues that BLM was predetermined in its selection, pointing to an alleged lack of sufficient evidence and not considering a broad range of potential benefits beyond removal of the wild horses. [ECF No. 50, at 56–61].

Wyoming advances the strongest rebuttal to Petitioners' argument. Although conceding that predetermination is contrary to NEPA, they note that "[c]ourts have a 'high' standard for finding that an agency predetermined its results." [ECF No. 55, at 51] (citing *Wyoming*, 661 F.3d at 1264). Pointing to the several changes made between the DEIS and the FEIS, Wyoming argues that such changes preclude finding the selection as predetermined, because BLM was not "irreversibly and irretrievably committed" to Alternative D. *Id.* at 51–52 (quoting *Forest Guardians*, 611 F.3d at 714).

In reply, FOA recontextualizes their position to argue that, while there were alternatives BLM could have selected, the selection was nonetheless predetermined insofar as all other alternatives still were to the benefit of RSGA. [ECF No. 61, at 28]. RTF takes a similar approach. First attempting to point out contradictions between the Respondents, RTF argues that the selection was predetermined because BLM's alternatives "were not genuine" and BLM analyzing such alternatives was not sufficient enough to be in good faith. [ECF No. 67, at 20].

The Court agrees with Respondents. Skirting the question of whether there were "reasonable and less-impactful alternatives," the Court focuses on whether RTF adequately alleges that BLM was predetermined in selecting the outcome. While both RTF and FOA attempt to recontextualize their position that the selection was predetermined, because the

61

other alternatives were either disingenuous or not seriously considered, that still fails to meet the "high" threshold. *Wyoming*, 661 F.3d at 1264. "[P]redetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome . . . ." *Forest Guardians*, 661 F.3d at 714 (emphasis original). However, the significant differences between the DEIS and FEIS—including retention of the White Mountain HMA—significantly undermines finding that BLM "irreversibly and irretrievably" committed itself to a certain outcome. *Forest Guardians*, 611 F.3d at 714. Insofar as BLM undertook "an objective, good faith inquiry into the environmental consequences" of the proposed action, while Petitioners argue that they did not consider the impacts of retaining wild horses, this is adequately explained by the fact that retaining wild horses would be contrary to RSGA's intentions. *Id.* (quotation). However, ultimately, the record shows that BLM did consider the environmental impact of removing the wild horses. *See* A.R. RMPA-001254.

Although RTF's and FOA's recontextualized position does not serve to meet their burden. To cast doubt on all other alternatives considered for being "not genuine," as RTF and FOA does, simply because they provide benefit to RSGA is not equivalent to preselecting "a certain outcome." Section 4 of the WHA requires landowner consent. 16 U.S.C. § 1334. The amendment process benefitting RSGA by proffering a series of alternatives that accounts for their revocation of consent is not a predetermined outcome,

but a broad range of outcomes reflecting the same objective.[7] Accordingly, the Court finds that Petitioners fail to satisfy their burden in pleading that BLM predetermined the outcome.

ii.    *Necessary Data Considered Before RMP Amendment.*

Next, RTF's contention that BLM failed to take a "hard look" due to lacking certain data is unavailing. RTF argues that BLM failed to take a "hard look" as the latter lacked data regarding genetic diversity, range conditions, and population numbers. [ECF No. 49, at 49–54]. Lacking this data, they continue, BLM was unable to make a reasoned decision and thus the RMP Amendment, issued in absence of such data, violated NEPA.

Federal Respondents stake their position upon arguing that the RMP Amendment is a programmatic-level decision, without site-specific determinations on how to implement a plan. [ECF No. 54, at 68–70]. Thus, they continue, much of the data RTF asserts is required for evaluation, is not relevant until BLM considers wild horse gathers. *Id.* at 68 (internal citations omitted). Even then, to the extent such data *would* be required, Federal Respondents argue that the FEIS *does* consider genetic diversity of herds and the potential diversity impacts caused by a change in AMLs. *Id.* at 69–70 (internal citations omitted).

In retort, RTF again argues that "BLM is mandated to conduct NEPA review using only current, accurate, relevant, and scientific data," and therefore Federal Respondents concede BLM lacked this information. [ECF No. 67, at 27]. Thus, they argue, failure to consider this requisite information constitutes a failure to take a "hard look." *Id.* at 28–29.

---

[7] By Petitioners' rationale, a person who has bought a new car made a predetermined selection by buying *any* new car—regardless of make or model.

The Court ultimately agrees with Federal Respondents. While all agency action must be "supported by substantial evidence" and a hard look under NEPA is best characterized as requiring "a reasonably thorough discussion of the significant aspects of the probable environmental consequences," this does not clearly suggest that this *specific data* was required for a programmatic-level decision. *Wyoming Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1241 (10th Cir. 2000) (first quotation); *Center for Biological Diversity v. U.S. Forest Serv.*, 2023 WL 5310633, at *8 (D. Mont. Aug. 17, 2023) (second quotation). Yet, even if required, the FEIS does appear to discuss genetic diversity and potential diversity impacts. *See* A.R. RMPA-001324–25, RMPA-001329, RMPA-001333, RMPA-001337.

Even if RTF is correct that a programmatic-level decision requires a "hard look" at specific data regarding genetic diversity, range conditions, and population numbers, the Court nonetheless turns to the considerations articulated in *Biodiversity Conservation Alliance*. 765 F.3d at 1271. The fact that the FEIS does discuss herd genetic diversity and potential diversity impacts undermines finding that "the agency 'entirely failed to consider an important aspect of the problem.'" *Id.* (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). Moreover, and in part because RTF focuses on arguing that BLM completely lacked such data, there is no indication that BLM "'offered an explanation for its decision that runs counter to the evidence before the agency.'" *Id.* Similarly, there is nothing to suggest that BLM's decision was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* Without these considerations warranting attention, this Court "will not second-guess the wisdom of the ultimate decision." *Citizens for*

*Alternatives to Radioactive Dumping*, 485 F.3d at 1098. Accordingly, the Court does not find that BLM failed to take a "hard look" in evaluating data regarding genetic diversity, range conditions, and population numbers.

          iii.          *Benefits and Impacts Considered.*

      The Court turns to addressing together the two concerns of FOA and RTF, who argue that BLM failed to consider the benefits of retaining wild horses as well as the impacts to wild horse viewing. Albeit wielded to conclude that BLM reached a predetermined decision, FOA argues that BLM failed to take a "hard look" at the positive impacts that wild horses have on the environment. [ECF No. 50, at 56–61]. In support, they state that BLM failed to consider, objectively and in good faith, "extensive evidence, including peer reviewed studies, demonstrating that wild horses have a positive impact on the ecosystem, most notably in the way they consume and digest forage." *Id.* at 56. Separately, RTF argues that BLM failed to take a "hard look" at the impacts to wild horse viewing opportunities as a result of shrinking HMA boundaries. [ECF No. 49, at 53].

      Federal Respondents address these arguments together. [ECF No. 54, at 70]. For both, they argue that BLM did consider these concerns as part of their "hard look." *Id.* Having taken a "hard look" at these benefits and impacts, Federal Respondents recast Petitioners' arguments as mere disagreement with BLM's ultimate decision. *Id.*

      FOA retorts that BLM's evaluation of wild horse benefits comes down to a one-statement change from the DEIS to the FEIS, and thus undermines finding that BLM took a "hard look." [ECF No. 61, at 32–33] (citing A.R. RMPA-001254). RTF does not

separately readdress their viewing impacts argument, but it appears to be subsumed in their broader "hard look" argument. [ECF No. 67, at 25–29].

Neither concern raised by FOA or RTF are grounds for finding that BLM failed to take a "hard look." Starting with the first, while FOA retorts that BLM's "hard look" merely comes down to a single addition from the DEIS to the FEIS, this does not warrant finding a NEPA violation. The single addition in question being a statement that "wild horse fecal matter can contribute some nutrients to the soils." A.R. RMPA-001254. FOA both calls this statement insufficient yet says that the "extensive evidence" they and others submitted in support of retaining wild horses "demonstrate[d] that wild horses have a positive impact on the ecosystem, *most notably in the way they consume and digest forage*." [ECF No. 50, at 56] (emphasis added) (internal citations omitted). Even if not detailed enough to satisfy FOA, there is nothing in FOA's argument identifying an area where BLM's analysis "undermine[d] informed public comment and informed decisionmaking." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017). In reality, that one statement hits the very crux of the "extensive evidence" FOA and others submitted.

Insofar as FOA argues that BLM "fail[ed] to offer any support for its conclusory statements or update its overall analysis of the alternatives to consider the positive impacts of wild horses violated NEPA[,] that contention is insignificant. [ECF No. 61, at 33] (citing *Davis v. Mineta*, 302 F.3d 1104, 1122–23 (10th Cir. 2002)). Applying the "rule of reason standard," this claimed deficiency in the FEIS is "merely [a] flyspeck[]" rather than "significant enough to defeat the goals of informed decisionmaking and informed public comment." *Utahns for Better Transp.*, 305 F.3d at 1163. Deferring to BLM, the brevity of

66

changes from the DEIS is most rationally explained as being fiercely outweighed by the negative impacts of retaining wild horses. Accordingly, the Court does not consider this issue as a failure to take a "hard look."

As for RTF's contention, the District of Colorado has stated that "[f]ailure to adequately evaluate effects on recreational interests in grounds to overturn a NEPA document." *High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1199 (D. Colo. 2014) (citing *National Parks & Conservation Ass'n v. Federal Aviation Admin.*, 988 F.2d 1523, 1533 (10th Cir. 1993)). Regardless of that decision's merit, it is functionally irrelevant here. Section 4.2.11 of the FEIS demonstrates that BLM explicitly considered the effects upon wild horse viewing, as a recreational interest, and ultimately recognized that there could be a negative impact to individuals "whose recreational experience would be enhanced by the presence of wild horses." A.R. RMPA-001281. Thus, although RTF disagrees with the ultimate decision, there is nothing to suggest that BLM did not evaluate wild horse viewing as part of their "hard look."

        iv.        *Increased Livestock Grazing Beyond RMP Amendment's Scope.*

Insofar as FOA argues that BLM violated NEPA by failing to consider the impact of reallocating wild horse AUMs to livestock grazing, the Court agrees with Federal Respondents that this issue falls beyond the scope of the RMP Amendment. As consistently reiterated by the Court, the RMP Amendment is a mere programmatic-level document, let alone one that orders the removal of wild horses. Nonetheless, RMP Amendment does not increase permitted livestock AUMs and explicitly states that such changes would happen

67

only "through future decision-making, based on further NEPA analysis including an in-depth review of intensive monitoring data . . . ." A.R. RMPA-001667.

While FOA does retort that a decrease in wild horse AUMs creates a situation where "[i]t is likely that livestock grazing will increase as ranchers capitalize on the removal of wild horses in grazing allotments," the operative word in this argument is "likely." [ECF No. 61, at 33. Although they continue that this is a "foreseeable" result, the RMP Amendment still does not actually increase livestock AUMs. The foreseeability of a livestock AUM increase is contingent upon BLM undertaking future decision-making. Accordingly, FOA's livestock grazing concern does not warrant finding a NEPA violation for failing to take a "hard look."

### v.  BLM Responded to Public Comments.

RTF's last argument, insofar as BLM allegedly did not respond to public comment, does not warrant finding that the latter failed to take a "hard look." RTF argues that, while "[t]he public has raised questions over whether this decision is consistent with multiple statutes and regulations, and BLM's own guidance manuals," BLM did not do so. [ECF No. 49, at 57]. As a prime example, they state that neither the DEIS nor the FEIS "specifies what 'population management tools' BLM intends to use to manage any of these HMAs," and continues that this is "a prerequisite to understanding the scope of expected effects on the herds in these HMAs." *Id.* Thus, because BLM allegedly has not responded to public comment and anticipating that Respondents will reiterate that this was a programmatic-level decision, RTF argues that BLM is improperly "[k]icking the can down the road." *Id.* at 60.

Federal Respondents start by noting that that "the only example [RTF] points to is that the RMP Amendment does not state the specific management tools BLM will use in the future or 'substantively' respond to comments on this issue." [ECF No. 54, at 71]. As anticipated, they continue with BLM explanation that "[d]ecisions on which specific population growth suppression strategies are utilized in a specific scenario are beyond the scope of" the FEIS and "potential impacts would be discussed in detail in a site specific NEPA analysis." *Id.*; A.R. RMPA-001505 (quotations). Nonetheless, even if required, Federal Respondents note that Appendix B of the FEIS "lists the type of population control techniques that may be implemented in the future" and BLM, in responding to comments on this issue, explained that Appendix B "describes and analyzes effects" of those strategies that are "reasonably foreseeable at the planning stage." [ECF No. 54, at 72] (citing A.R. RMPA-001499).

As with their argument on impacts to wild horse viewing, RTF does not separately readdress this argument but largely subsumes it within a broader "hard look" rebuke. [ECF No. 67, at 25–27].

The Court agrees with Federal Respondents. Without taking another chance to reiterate that this is a programmatic-level decision, even assuming that BLM is required to take a "hard look" that includes addressing public comments specifically on population management methods, the Court defers to BLM's wisdom. *Citizens for Alternatives to Radioactive Dumping*, 485 F.3d at 1098. Appendix B directly rebuts any finding by this Court that BLM "'entirely failed to consider an important aspect of the problem,'" as it lists such strategies and because BLM explained that Appendix B describes and analyzes

69

the effects of those strategies which are reasonably foreseeable. *Biodiversity Conservation All.*, 765 F.3d at 1271 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). Such an explanation does not appear to "'run[] counter to the evidence before the agency,'" nor "so implausible" that it cannot be "ascribed to a difference in view or the product of agency expertise." *Id.* Thus, the Court "will not second-guess the wisdom of the ultimate decision." *Citizens for Alternatives to Radioactive Dumping*, 485 F.3d at 1098. Accordingly, the Court finds no basis to conclude that BLM violated NEPA for failure to take a "hard look."

## CONCLUSION

IT IS HEREBY ORDERED that BLM's May 6, 2023, ROD is AFFIRMED. The Court concludes that Petitioners lack an actionable claim under the Administrative Procedures Act. 5 U.S.C. § 706(2)(A).

Dated this 14th day of August, 2024.

_____
Kelly H. Rankin
United States District Judge

70

FILED



1:47 pm, 8/14/24

**Margaret Botkins
Clerk of Court**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

---

AMERICAN WILD HORSE
CAMPAIGN; ANIMAL WELFARE
INSTITUTE; WESTERN
WATERSHEDS PROJECT; CAROL
WALKER; CHAD HANSON; and
KIMERLEE CURYL,

        Petitioners,

    vs.

TRACY STONE-MANNING, Bureau of
Land Management Director, in her official
capacity; and DEB HAALAND, Secretary
of the Department of the Interior, in her
official capacity,

        Respondents,

    and

STATE OF WYOMING; and ROCK
SPRINGS GRAZING ASSOCIATION, a
Wyoming corporation,

        Respondent-Intervenors.

Civil Nos.  23-CV-84-KHR (Lead)
               23-CV-87-KHR (Joined)
               23-CV-117-KHR (Joined)

---

RETURN TO FREEDOM, a nonprofit
organization; FRONT RANGE EQUINE
RESCUE, a nonprofit organization; MEG
FREDERICK; and ANGELIQUE REA,

        Petitioners,

    vs.

DEB HAALAND, Secretary of the
Department of the Interior, in her official
capacity; TRACY STONE-MANNING,
Bureau of Land Management Director, in
her official capacity; and KIMBERLEE
FOSTER, Bureau of Land Management
Rock Springs Field Office Manager, in her
official capacity,

           Respondents.

---

FRIENDS OF ANIMALS, a 501(c)(3)
organization,

           Petitioner,

    vs.

DEB HAALAND, Secretary of the
Department of the Interior, in her official
capacity; and BUREAU OF LAND
MANAGEMENT,

           Respondents.

---

## JUDGMENT IN A CIVIL ACTION

These joined cases came before the Court under the Administrative Procedure Act

(APA) for judicial review of the Bureau of Land Management's (BLM) actions through

the Resource Management Plan Amendment and finalized in its May 6, 2023 Record of

Decision regarding the Rock Springs and Rawlins Field Offices. The Court entered an

Order Affirming Agency Action, which is fully incorporated herein by this reference. In

accordance with the findings of fact and conclusions of law set forth in that Order:

2

IT IS HEREBY ORDERED AND ADJUDGED that Petitioners fail to establish that BLM's actions were arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, nor that they were in excess of statutory jurisdiction, authority, limitations, or short of statutory right. 5 U.S.C. § 706(2)(A), (C). Accordingly, BLM's Resource Management Plan Amendment and corresponding May 6, 2023 Record of Decision is UPHELD AND AFFIRMED.

FINAL JUDGMENT is hereby entered accordingly.

Dated this 14th day of August, 2024.

Kelly H. Rankin
United States District Judge

WYD 91

Matthew R. Arnold
(*Admitted pro hac vice*)
Eubanks & Associates, PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
Phone: (843) 718-4513
matt@eubankslegal.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| AMERICAN WILD HORSE CAMPAIGN, et al., | |
| *Petitioners*, | Civ. No. 2:23-cv-00084-KHR |
| v. | (*Consolidated with Nos. 2:23-cv-00087-KHR & 2:23-cv-00117-KHR*) |
| TRACY STONE-MANNING, et al., | |
| *Respondents*. | |

**NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR
THE TENTH CIRCUIT**

1

Petitioners American Wild Horse Campaign, Animal Welfare Institute, Western Watersheds Project, Carol Walker, Kimerlee Curyl, and Chad Hanson hereby notice their appeal to the United States Court of Appeals for the Tenth Circuit the following orders from this Court:

1. August 14, 2024 Order Affirming Agency Action (ECF No. 80);

2. August 14, 2024 Judgment in a Civil Action (ECF No. 81).

Respectfully submitted,

/s/ *Matthew Arnold*
Matthew R. Arnold
(*Admitted pro hac vice*)
Eubanks & Associates, PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
Phone: (843) 718-4513
matt@eubankslegal.com

William S. Eubanks II
(*Admitted pro hac vice*)
Eubanks & Associates, PLLC
1629 K Street, NW, Suite 300
Washington, DC 20006
Phone: (970) 703-6060
bill@eubankslegal.com

Leah Schwartz
Wyo. Bar. No. 7-5019
Parsons Behle & Latimer
20 E. Simpson Avenue
Jackson, WY 83001
(307) 733-5130
leah@parsonsbehle.com

*Counsel for Petitioners American Wild Horse Campaign, Animal Welfare Institute, Western Watersheds Project, Carol Walker, Kimerlee Curyl, and Chad Hanson*

,

2